Welfare Commissioner *v.* Anonymous (1976–10)*

Superior Court

Rubinow, J. The proceedings leading to the present appeal began with petitions of the commissioner of welfare, hereinafter referred to as the commissioner, to the Juvenile Court. In the petitions, which were dated in 1974, the commissioner alleged that each of the defendants' four children was then "uncared-for in that: He [or She] is homeless. The [defendant] mother is presently an inmate at Niantic Women's Prison. The [defendant] father is living alone and working full time. . . . [His] income and circumstances do not permit him to provide a home for his children." The father admitted the allegations of the petition; the mother, however, did not, her claim being that

---

* Thus entitled, in view of General Statutes § 17-70 (b) and Practice Book § 405.

the children are not "uncared for" within the purview of that phrase as used in General Statutes § 17-53.

When the petition was filed, and at all relevant subsequent times, the children were being cared for by their grandaunt. They had been placed with her in 1973, by the welfare department, with the consent of the father. That department had been assisting him to care for the children after the mother had been sentenced to Niantic in 1972, following her conviction for armed robbery. When the grandaunt took the children, there had been no adjudication that they were either uncared for or neglected, and no proceedings were then pending to obtain such an adjudication.

After the petitions had been brought, a series of hearings was held and briefs were filed. In 1975 the Juvenile Court entered an order committing the four children to the commissioner. That order was entered pursuant to an adjudication made by the Juvenile Court that the children "are uncared-for."[1] At the hearing at which that adjudication was made, the assistant attorney general, appearing for the commissioner, said, "There is no question about the home situation where the children are now. Everybody is agreed that it is a good situation for them and there is no dispute on that fact here." In confirmation of that statement, the updated social summary, prepared for a hearing on disposition in 1975 says: ". . . [The grandaunt] continues to provide an excellent home for these children. She is providing for them a warm, secure environment for the first time in their lives. The

---

[1] Although the order of commitment of the Juvenile Court contains a finding that each child "is an uncared for-neglected child," the printed word "neglected" should have been deleted from the order. The Juvenile Court expressly noted "(N)ot neglected just uncared-for." Further, the commissioner does not claim the children are neglected.

biggest problem has been interference in her role of caretaker by . . . [the mother's] extended family and friends. . . . [The children's] only chance of becoming normal, productive members of the community lies in their remaining for the present in a warm, accepting environment, and receiving the necessary support through therapy and the . . . [protection] of the Welfare Commissioner through the supervision of the Department of Children and Youth Services. We feel that this goal cannot be achieved, or even attempted unless they remain for the present in their current home."

From that social summary, as well as from the quoted comment of the assistant attorney general, it is apparent that the children are neither uncared for nor homeless. Indeed, there is no evidence in the Juvenile Court proceedings that does not tend to prove that the grandaunt provides a good home for the children and takes good care of them. Nevertheless, the commissioner claims that the Juvenile Court could properly find that the children are uncared for and homeless within the purview of General Statutes § 17-53. His claim is that the children are "uncared for" because their mother is not taking care of them and is not providing a home for them and because their father has, either inferentially or explicitly, admitted that he cannot take care of them or make a home for them. The commissioner's claim, in short, is that the phrase "uncared for" in General Statutes § 17-53 should be construed as if it read "uncared for by each living biological parent."

There are three reasons why that construction of the statute should not be adopted. First, that construction requires the court to legislate into the statute significant words that are not there. Second, if a child is being properly cared for by, for example, a close relative at the request of a biological

parent, the commissioner's construction would require the court to say that a child is "uncared for" when, in fact, the child is "cared for." See, e.g., *Painter* v. *Bannister*, 258 Iowa 1390 (permanent custody of seven-year-old boy awarded to sixty-year-old maternal grandparents, who had been asked by father of boy to take temporary charge of him following death of the boy's mother). That construction would, therefore, lead to "possibly bizarre results," and a construction leading to those results should not be adopted. See *City Savings Bank* v. *Lawler*, 163 Conn. 149, 159. Third, the commissioner's construction would have the undesirable consequence of discouraging biological parents from even temporarily entrusting their children to someone who could give them better care, for, under the commissioner's construction, even temporarily entrusting children to a nonbiological parent to enable the children to be better cared for would make the children "uncared for" and subject to commitment to the commissioner.

Even if those three reasons did not exist for not adopting the commissioner's construction, the court would not adopt it for a reason of "policy." That "policy" reason is that, in construing a statute concerning the relationship of children to biological or nonbiological parents,[2] courts should prefer that construction which minimizes state intervention. The reason for preferring the minimal-state-intervention construction has been well expressed in a recent work on problems in child custody: "Though obvious once said, when left unsaid, the

---

[2] Goldstein, Freud & Solnit in "Beyond the Best Interests of the Child" write of the two aspects of parenthood—biological parenthood and psychological parenthood. The latter describes (p. 17) the person to whom the child is emotionally attached as a result of that person's "attention to [the child's] needs for physical care, nourishment, comfort, affection and stimulation." A nonbiological parent may, of course, be a psychological parent.

limitations of law often go unacknowledged in discussions about child placement. Too frequently there is attributed to law and its agents a magical power—a power to do what is far beyond its means. While the law may claim to establish relationships, it can in fact do little more than give them recognition and provide an opportunity for them to develop. The law, so far as specific individual relationships are concerned, is a relatively crude instrument. It may be able to destroy human relationships; but it does not have the power to compel them to develop. It neither has the sensitivity nor the resources to maintain or supervise the ongoing day-to-day happenings between parent and child— and these are essential to meeting ever-changing demands and needs. Nor does it have the capacity to predict future events and needs, which would justify or make workable over the long run any specific conditions it might impose concerning, for example, education, visitation, health care, or religious upbringing. We share the view—one which is too easily ignored in the law and administration of child placement—of Justice Wachenfeld:[3] 'The uncertainties of life . . . will always remain to be encountered as long as one lives. . . . Their devious forms and variations are too complicated and numerous to be susceptible of tabulation. Our inability to predict or solve them anchors us closely to nature's intendment. . . . A judicial approach does not make the future more readily foreseeable and the assurance of our decisions, whatever it be, is unfortunately circumscribed by the frailties of human judgment.' The law, then, ought to and generally does prefer the private ordering of interpersonal relationships over state intrusions on them." Goldstein, Freud & Solnit, op. cit., p. 49.

---

[3] For the source of the quotation by Justice Wachenfeld see Goldstein, Freud & Solnit, op. cit., p. 147 n.33.

The preference for nonintrusion is reflected in several of the authorities cited by the mother in her briefs. For example, in *Diernfeld* v. *People,* 137 Colo. 238, 243 (mother's conviction twice for felony not sufficient to invoke jurisdiction of Juvenile Court where child was being taken care of by grandmother) the court said: "If the person in whose care the child is placed assumes the responsibility, is not being imposed upon, and there is no dispute among persons entitled to the custody of the child, the jurisdiction of the court cannot be invoked and the state is not concerned in the matter." Similarly, in *In re State in Interest of Valdez,* 29 Utah 2d 63, the court noted that the Juvenile Court is created by statute and that its jurisdiction concerning custody is strictly limited to those situations in which the statute permits it to be invoked. *In re State in Interest of Valdez,* supra, 66 (father who had been incarcerated for killing mother made arrangements with maternal aunt and uncle to care for children; Juvenile Court held to have no jurisdiction in absence of proof that statutory condition, that child is "homeless or without proper care through no fault of his parent, guardian, or custodian," had been met).

There is one further consideration. When the children were committed to the commissioner, they had been with their grandaunt for almost two years. She had established conclusively that her "caring for" them was not a temporary activity but the result of a relationship and concern of proven durability. When the children were entrusted to her care, the oldest was not quite eight years old and the youngest was two years and eight months. The other two were, respectively, five years old and six years and eight months. To children of those ages, two years is a time span of far greater significance than it is to adults.[4] New and lasting attachments

---

[4] See Goldstein, Freud & Solnit, op. cit., p. 40.

can be formed under those circumstances and, all parties seem to agree, have been formed in this case. The depth of that attachment has been reflected in the high praise given to the grandaunt in the social summary and in the general agreement that the children have an excellent home and have received excellent care with her. Whatever merit there may be in the commissioner's construction of the phrase "uncared for" in other situations where care is not being provided for by the biological parent, the facts with respect to these children and the care they have received make them not "uncared for," as a matter of law, within the meaning of that phrase in General Statutes § 17-53.

The only authority cited by the commissioner, *In re Appeal of Kindis,* 162 Conn. 239, is inapposite. In that case, the children were committed to the commissioner in 1963. Six years later, their mother filed a petition seeking revocation of the order of commitment, claiming that "cause for commitment no longer exists." The Juvenile Court considered (p. 244) the circumstances "which presently prevailed in the parental home," and concluded that "cause for commitment" continued to exist. That case thus decides that, if there was an originally valid "cause for commitment," the circumstances to be considered in determining whether that cause continues to exist are the circumstances in the parental home and not the circumstances in the foster home. In this case, the question is not whether an originally valid "cause for commitment" continues to exist but whether an originally valid "cause for commitment" ever existed.

The court is not unmindful of the evidence that some of the children may have had, and may still need, psychiatric and special education services. It is clear from the evidence, however, that the need

for those services arose out of events which occurred before the grandaunt began taking care of the children. Further, there is no reason why, if the children do still need those services, those services cannot be provided for them without committing them to the custody of the commissioner. The issue in this case is, however, not whether they are in need of those services from the commissioner and other appropriate state agencies but whether the present status of those children justifies their being classified as "uncared for" within the purview of General Statutes § 17-53.

Nor is the court unmindful of the possibility that the mother may in the future attempt to regain custody of the children. If that happens, and litigation results, the court will then have to determine where the best interests of the children lie. If there is no litigation, and the mother, after taking custody of the children, fails to provide them with adequate care, there is ample statutory authority for then invoking the jurisdiction of the court. There is a suggestion in the record that a dissolution of marriage proceeding has been instituted between the mother and father. If such a proceeding is pending, there is statutory authority for third-party intervention with respect to custody and for the appointment of an attorney to represent the children. See General Statutes §§ 46-47 and 46-43. At this stage in the proceedings, however, all of those possibilities lie in the future, and the issues they would present are not the issues to be decided in the present case.

The appeal is sustained and judgment may enter vacating the order of the Juvenile Court committing the children to the commissioner of welfare.