# LASSITER *v.* DEPARTMENT OF SOCIAL SERVICES OF DURHAM COUNTY, NORTH CAROLINA

No. 79–6423. Argued February 23, 1981—Decided June 1, 1981

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 34. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 35. STEVENS, J., filed a dissenting opinion, *post*, p. 59.

*Leowen Evans* argued the cause *pro hac vice* for petitioner. With him on the briefs were *Gregory C. Malhoit* and *Robert L. Walker.*

*Thomas Russell Odom* argued the cause for respondent. With him on the brief was *Lester W. Owen.*

*Steven Mansfield Shaber,* Assistant Attorney General, argued the cause for the State of North Carolina as *amicus curiae* urging affirmance. With him on the brief for the State of North Carolina et al. as *amici curiae* were *Rufus L. Edmisten,* Attorney General of North Carolina; *Richard S. Gebelein,* Attorney General of Delaware, and *Regina Mullen Small,* State Solicitor; *Bill Allain,* Attorney General of Mississippi, and *Jim R. Bruce,* Special Assistant Attorney General; *Jim Smith,* Attorney General of Florida, and *Sidney H. McKenzie,* Assistant Attorney General; *Richard R. Bryan,* Attorney General of Nevada, and *Claudia K. Cormier,* Deputy Attorney General; and *Steve Clark,* Attorney General of Arkansas, and *Robert R. Ross,* Deputy Attorney General.*

JUSTICE STEWART delivered the opinion of the Court.

I

In the late spring of 1975, after hearing evidence that the petitioner, Abby Gail Lassiter, had not provided her infant son William with proper medical care, the District Court of Durham County, N. C., adjudicated him a neglected child and transferred him to the custody of the Durham County Department of Social Services, the respondent here. A year later, Ms. Lassiter was charged with first-degree murder, was convicted of second-degree murder, and began a sentence of 25 to 40 years of imprisonment.[1] In 1978 the Department

---

*Briefs of *amici curiae* urging reversal were filed by *Louise Gruner Gans, Catherine P. Mitchell,* and *Phyllis Gelman* for the National Center on Women and Family Law, Inc., et al.; by *David R. Lundberg* for the National Legal Aid and Defender Association; and by *Robert S. Payne* for the North Carolina Civil Liberties Union.

*Wm. Reece Smith, Jr.,* filed a brief for the American Bar Association as *amicus curiae.*

[1] The North Carolina Court of Appeals, in reviewing the petitioner's conviction, indicated that the murder occurred during an altercation between Ms. Lassiter, her mother, and the deceased:

"Defendant's mother told [the deceased] to 'come on.' They began to struggle and deceased fell or was knocked to the floor. Defendant's

petitioned the court to terminate Ms. Lassiter's parental rights because, the Department alleged, she "has not had any contact with the child since December of 1975" and "has willfully left the child in foster care for more than two consecutive years without showing that substantial progress has been made in correcting the conditions which led to the removal of the child, or without showing a positive response to the diligent efforts of the Department of Social Services to strengthen her relationship to the child, or to make and follow through with constructive planning for the future of the child."

Ms. Lassiter was served with the petition and with notice that a hearing on it would be held. Although her mother had retained counsel for her in connection with an effort to invalidate the murder conviction, Ms. Lassiter never mentioned the forthcoming hearing to him (or, for that matter, to any other person except, she said, to "someone" in the prison). At the behest of the Department of Social Services' attorney, she was brought from prison to the hearing, which was held August 31, 1978. The hearing opened, apparently at the judge's instance, with a discussion of whether Ms. Lassiter should have more time in which to find legal assistance.

---

mother was beating deceased with a broom. While deceased was still on the floor and being beaten with the broom, defendant entered the apartment. She went into the kitchen and got a butcher knife. She took the knife and began stabbing the deceased who was still prostrate. The body of deceased had seven stab wounds . . . ." *State* v. *Lassiter,* No. 7614SC1054 (June 1, 1977).

After her conviction was affirmed on appeal, Ms. Lassiter sought to attack it collaterally. Among her arguments was that the assistance of her trial counsel had been ineffective because he had failed to "seek to elicit or introduce before the jury the statement made by [Ms. Lassiter's mother,] 'And I did it, I hope she dies.' " Ms. Lassiter's mother had, like Ms. Lassiter, been indicted on a first-degree murder charge; however, the trial court granted the elder Ms. Lassiter's motion for a nonsuit. The North Carolina General Court of Justice, Superior Court Division, denied Ms. Lassiter's motion for collateral relief. File No. 76–CR–3102 (Mar. 20, 1979).

Since the court concluded that she "has had ample opportunity to seek and obtain counsel prior to the hearing of this matter, and [that] her failure to do so is without just cause," the court did not postpone the proceedings. Ms. Lassiter did not aver that she was indigent, and the court did not appoint counsel for her.

A social worker from the respondent Department was the first witness. She testified that in 1975 the Department "received a complaint from Duke Pediatrics that William had not been followed in the pediatric clinic for medical problems and that they were having difficulty in locating Ms. Lassiter . . . ." She said that in May 1975 a social worker had taken William to the hospital, where doctors asked that he stay "because of breathing difficulties [and] malnutrition and [because] there was a great deal of scarring that indicated that he had a severe infection that had gone untreated." The witness further testified that, except for one "prearranged" visit and a chance meeting on the street, Ms. Lassiter had not seen William after he had come into the State's custody, and that neither Ms. Lassiter nor her mother had "made any contact with the Department of Social Services regarding that child." When asked whether William should be placed in his grandmother's custody, the social worker said he should not, since the grandmother "has indicated to me on a number of occasions that she was not able to take responsibility for the child" and since "I have checked with people in the community and from Ms. Lassiter's church who also feel that this additional responsibility would be more than she can handle." The social worker added that William "has not seen his grandmother since the chance meeting in July of '76 and that was the only time."

After the direct examination of the social worker, the judge said:

"I notice we made extensive findings in June of '75 that you were served with papers and called the social

services and told them you weren't coming; and the serious lack of medical treatment. And, as I have said in my findings of the 16th day of June '75, the Court finds that the grandmother, Ms. Lucille Lassiter, mother of Abby Gail Lassiter, filed a complaint on the 8th day of May, 1975, alleging that the daughter often left the children, Candina, Felicia and William L. with her for days without providing money or food while she was gone."

Ms. Lassiter conducted a cross-examination of the social worker, who firmly reiterated her earlier testimony. The judge explained several times, with varying degrees of clarity, that Ms. Lassiter should only ask questions at this stage; many of her questions were disallowed because they were not really questions, but arguments.

Ms. Lassiter herself then testified, under the judge's questioning, that she had properly cared for William. Under cross-examination, she said that she had seen William more than five or six times after he had been taken from her custody and that, if William could not be with her, she wanted him to be with her mother since, "He knows us. Children know they family. . . . They know they people, they know they family and that child knows us anywhere. . . . I got four more other children. Three girls and a boy and they know they little brother when they see him."

Ms. Lassiter's mother was then called as a witness. She denied, under the questioning of the judge, that she had filed the complaint against Ms. Lassiter, and on cross-examination she denied both having failed to visit William when he was in the State's custody and having said that she could not care for him.

The court found that Ms. Lassiter "has not contacted the Department of Social Services about her child since December, 1975, has not expressed any concern for his care and welfare, and has made no efforts to plan for his future." Be-

24

cause Ms. Lassiter thus had "wilfully failed to maintain concern or responsibility for the welfare of the minor," and because it was "in the best interests of the minor," the court terminated Ms. Lassiter's status as William's parent.[2]

On appeal, Ms. Lassiter argued only that, because she was indigent, the Due Process Clause of the Fourteenth Amendment entitled her to the assistance of counsel, and that the trial court had therefore erred in not requiring the State to provide counsel for her. The North Carolina Court of Appeals decided that "[w]hile this State action does invade a protected area of individual privacy, the invasion is not so serious or unreasonable as to compel us to hold that appointment of counsel for indigent parents is constitutionally mandated." *In re Lassiter,* 43 N. C. App. 525, 527, 259 S. E. 2d 336, 337. The Supreme Court of North Carolina summarily denied Ms. Lassiter's application for discretionary review, 299 N. C. 120, 262 S. E. 2d 6, and we granted certiorari to consider the petitioner's claim under the Due Process Clause of the Fourteenth Amendment, 449 U. S. 819.

II

For all its consequence, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which

---

[2] The petition had also asked that the parental rights of the putative father, William Boykin, be terminated. Boykin was not married to Ms. Lassiter, he had never contributed to William's financial support, and indeed he denied that he was William's father. The court granted the petition to terminate his alleged parental status.

must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

## A

The pre-eminent generalization that emerges from this Court's precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation. Thus, when the Court overruled the principle of *Betts* v. *Brady,* 316 U. S. 455, that counsel in criminal trials need be appointed only where the circumstances in a given case demand it, the Court did so in the case of a man sentenced to prison for five years. *Gideon* v. *Wainwright,* 372 U. S. 335. And thus *Argersinger* v. *Hamlin,* 407 U. S. 25, established that counsel must be provided before any indigent may be sentenced to prison, even where the crime is petty and the prison term brief.

That it is the defendant's interest in personal freedom, and not simply the special Sixth and Fourteenth Amendments right to counsel in criminal cases, which triggers the right to appointed counsel is demonstrated by the Court's announcement in *In re Gault,* 387 U. S. 1, that "the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency *which may result in commitment to an institution in which the juvenile's freedom is curtailed,"* the juvenile has a right to appointed counsel even though those proceedings may be styled "civil" and not "criminal." *Id.,* at 41 (emphasis added). Similarly, four of the five Justices who reached the merits in *Vitek* v. *Jones,* 445 U. S. 480, concluded that an indigent prisoner is entitled to appointed counsel before being involuntarily transferred for treatment to a state mental hospital. The fifth Justice differed from the other four only in declining to exclude the "possibility that the required assist-

ance may be rendered by competent laymen in some cases." *Id.,* at 500 (separate opinion of POWELL, J.).

Significantly, as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel. In *Gagnon* v. *Scarpelli,* 411 U. S. 778, the Court gauged the due process rights of a previously sentenced probationer at a probation-revocation hearing. In *Morrissey* v. *Brewer,* 408 U. S. 471, 480, which involved an analogous hearing to revoke parole, the Court had said: "Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions." Relying on that discussion, the Court in *Scarpelli* declined to hold that indigent probationers have, *per se,* a right to counsel at revocation hearings, and instead left the decision whether counsel should be appointed to be made on a case-by-case basis.

Finally, the Court has refused to extend the right to appointed counsel to include prosecutions which, though criminal, do not result in the defendant's loss of personal liberty. The Court in *Scott* v. *Illinois,* 440 U. S. 367, for instance, interpreted the "central premise of *Argersinger*" to be "that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment," and the Court endorsed that premise as "eminently sound and warrant[ing] adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel." *Id.,* at 373. The Court thus held "that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense." *Id.,* at 373–374.

In sum, the Court's precedents speak with one voice about what "fundamental fairness" has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a

right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

## B

The case of *Mathews* v. *Eldridge,* 424 U. S. 319, 335, propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to "the companionship, care, custody, and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois,* 405 U. S. 645, 651. Here the State has sought not simply to infringe upon that interest, but to end it. If the State prevails, it will have worked a unique kind of deprivation. Cf. *May* v. *Anderson,* 345 U. S. 528, 533; *Armstrong* v. *Manzo,* 380 U. S. 545. A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.[3]

Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed coun-

---

[3] Some parents will have an additional interest to protect. Petitions to terminate parental rights are not uncommonly based on alleged criminal activity. Parents so accused may need legal counsel to guide them in understanding the problems such petitions may create.

sel. If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal. North Carolina itself acknowledges as much by providing that where a parent files a written answer to a termination petition, the State must supply a lawyer to represent the child. N. C. Gen. Stat. § 7A–289.29 (Supp. 1979).

The State's interests, however, clearly diverge from the parent's insofar as the State wishes the termination decision to be made as economically as possible and thus wants to avoid both the expense of appointed counsel and the cost of the lengthened proceedings his presence may cause. But though the State's pecuniary interest is legitimate, it is hardly significant enough to overcome private interests as important as those here, particularly in light of the concession in the respondent's brief that the "potential costs of appointed counsel in termination proceedings . . . is [sic] admittedly de minimis compared to the costs in all criminal actions."

Finally, consideration must be given to the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel. North Carolina law now seeks to assure accurate decisions by establishing the following procedures: A petition to terminate parental rights may be filed only by a parent seeking the termination of the other parent's rights, by a county department of social services or licensed child-placing agency with custody of the child, or by a person with whom the child has lived continuously for the two years preceding the petition. § 7A–289.24. A petition must describe facts sufficient to warrant a finding that one of the grounds for termination exists, § 7A–289.25 (6), and the parent must be notified of the petition and given 30 days in which to file a written answer to it,

§ 7A–289.27. If that answer denies a material allegation, the court must, as has been noted, appoint a lawyer as the child's guardian *ad litem* and must conduct a special hearing to resolve the issues raised by the petition and the answer. § 7A–289.29. If the parent files no answer, "the court shall issue an order terminating all parental and custodial rights . . . ; provided the court shall order a hearing on the petition and may examine the petitioner or others on the facts alleged in the petition." § 7A–289.28. Findings of fact are made by a court sitting without a jury and must "be based on clear, cogent, and convincing evidence." § 7A–289.30. Any party may appeal who gives notice of appeal within 10 days after the hearing. § 7A–289.34.[4]

The respondent argues that the subject of a termination hearing—the parent's relationship with her child—far from being abstruse, technical, or unfamiliar, is one as to which the parent must be uniquely well informed and to which the parent must have given prolonged thought. The respondent also contends that a termination hearing is not likely to produce difficult points of evidentiary law, or even of substantive law, since the evidentiary problems peculiar to criminal trials are not present and since the standards for termination are not complicated. In fact, the respondent reports, the North Carolina Departments of Social Services are themselves sometimes represented at termination hearings by social workers instead of by lawyers.[5]

---

[4] The respondent also points out that parental termination hearings commonly occur only after a custody proceeding in which the child has judicially been found to be abused, neglected, or dependent, and that an indigent parent has a right to be represented by appointed counsel at the custody hearing. § 7A–587.

Ms. Lassiter's hearing occurred before some of these provisions were enacted. She did not, for instance, have the benefit of the "clear, cogent, and convincing" evidentiary standard, nor did she have counsel at the hearing in which William was taken from her custody.

[5] Both the respondent and the Columbia Journal of Law and Social Problems, 4 Colum. J. L. & Soc. Prob. 230 (1968), have conducted surveys

Yet the ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uncounseled parent is evident from the findings some courts have made. See, *e. g., Davis* v. *Page,* 442 F. Supp. 258, 261 (SD Fla. 1977); *State* v. *Jamison,* 251 Ore. 114, 117–118, 444 P. 2d 15, 17 (1968). Thus, courts have generally held that the State must appoint counsel for indigent parents at termination proceedings. *State ex rel. Heller* v. *Miller,* 61 Ohio St. 2d 6, 399 N. E. 2d 66 (1980); *Department of Public Welfare* v. *J. K. B.,* 379 Mass. 1, 393 N. E. 2d 406 (1979); *In re Chad S.,* 580 P. 2d 983 (Okla. 1978); *In re Myricks,* 85 Wash. 2d 252, 533 P. 2d 841 (1975); *Crist* v. *Division of Youth and Family Services,* 128 N. J. Super. 102, 320 A. 2d 203 (1974); *Danforth* v. *Maine Dept. of Health and Welfare,* 303 A. 2d 794 (Me. 1973); *In re Friesz,* 190 Neb. 347, 208 N. W. 2d 259 (1973).[6] The respondent is able to point to no presently authoritative case, except for the North Caro-

purporting to reveal whether the presence of counsel reduces the number of erroneous determinations in parental termination proceedings. Unfortunately, neither survey goes beyond presenting statistics which, standing alone, are unilluminating. The Journal note does, however, report that it questioned the New York Family Court judges who preside over parental termination hearings and found that 72.2% of them agreed that when a parent is unrepresented, it becomes more difficult to conduct a fair hearing (11.1% of the judges disagreed); 66.7% thought it became difficult to develop the facts (22.2% disagreed).

[6] A number of courts have held that indigent parents have a right to appointed counsel in child dependency or neglect hearings as well. *E. g., Davis* v. *Page,* 640 F. 2d 599 (CA5 1981) (en banc); *Cleaver* v. *Wilcox,* 499 F. 2d 940 (CA9 1974) (right to be decided case by case); *Smith* v. *Edmiston,* 431 F. Supp. 941 (WD Tenn. 1977).

lina judgment now before us, holding that an indigent parent has no due process right to appointed counsel in termination proceedings.

## C

The dispositive question, which must now be addressed, is whether the three *Eldridge* factors, when weighed against the presumption that there is no right to appointed counsel in the absence of at least a potential deprivation of physical liberty, suffice to rebut that presumption and thus to lead to the conclusion that the Due Process Clause requires the appointment of counsel when a State seeks to terminate an indigent's parental status. To summarize the above discussion of the *Eldridge* factors: the parent's interest is an extremely important one (and may be supplemented by the dangers of criminal liability inherent in some termination proceedings); the State shares with the parent an interest in a correct decision, has a relatively weak pecuniary interest, and, in some but not all cases, has a possibly stronger interest in informal procedures; and the complexity of the proceeding and the incapacity of the uncounseled parent could be, but would not always be, great enough to make the risk of an erroneous deprivation of the parent's rights insupportably high.

If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed," *Gagnon* v. *Scarpelli*, 411 U. S., at 788, neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in *Gagnon* v. *Scar-*

*pelli,* and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review. See, *e. g., Wood* v. *Georgia,* 450 U. S. 261.

### III

Here, as in *Scarpelli,* "[i]t is neither possible nor prudent to attempt to formulate a precise and detailed set of guidelines to be followed in determining when the providing of counsel is necessary to meet the applicable due process requirements," since here, as in that case, "[t]he facts and circumstances . . . are susceptible of almost infinite variation . . . ." 411 U. S., at 790. Nevertheless, because child-custody litigation must be concluded as rapidly as is consistent with fairness,[7] we decide today whether the trial judge denied Ms. Lassiter due process of law when he did not appoint counsel for her.

The respondent represents that the petition to terminate Ms. Lassiter's parental rights contained no allegations of neglect or abuse upon which criminal charges could be based, and hence Ms. Lassiter could not well have argued that she required counsel for that reason. The Department of Social Services was represented at the hearing by counsel, but no expert witnesses testified, and the case presented no specially troublesome points of law, either procedural or substantive. While hearsay evidence was no doubt admitted, and while Ms. Lassiter no doubt left incomplete her defense that the Department had not adequately assisted her in rekindling her interest in her son, the weight of the evidence that she had few sparks of such an interest was sufficiently great that the

---

[7] According to the respondent's brief, William Lassiter is now living "in a pre-adoptive home with foster parents committed to formal adoption to become his legal parents." He cannot be legally adopted, nor can his status otherwise be finally clarified, until this litigation ends.

presence of counsel for Ms. Lassiter could not have made a determinative difference. True, a lawyer might have done more with the argument that William should live with Ms. Lassiter's mother—but that argument was quite explicity made by both Lassiters, and the evidence that the elder Ms. Lassiter had said she could not handle another child, that the social worker's investigation had led to a similar conclusion, and that the grandmother had displayed scant interest in the child once he had been removed from her daughter's custody was, though controverted, sufficiently substantial that the absence of counsel's guidance on this point did not render the proceedings fundamentally unfair.[8] Finally, a court deciding whether due process requires the appointment of counsel need not ignore a parent's plain demonstration that she is not interested in attending a hearing. Here, the trial court had previously found that Ms. Lassiter had expressly declined to appear at the 1975 child custody hearing, Ms. Lassiter had not even bothered to speak to her retained lawyer after being notified of the termination hearing, and the court specifically found that Ms. Lassiter's failure to make an effort to contest the termination proceeding was without cause. In view of all these circumstances, we hold that the trial court did not err in failing to appoint counsel for Ms. Lassiter.

## IV

In its Fourteenth Amendment, our Constitution imposes on the States the standards necessary to ensure that judicial proceedings are fundamentally fair. A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution. Informed opinion has clearly come to hold that an indigent parent is

---

[8] Ms. Lassiter's argument here that her mother should have been given custody of William is hardly consistent with her argument in the collateral attack on her murder conviction that she was innocent because her mother was guilty. See n. 1, *supra*.

entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well. IJA–ABA Standards for Juvenile Justice, Counsel for Private Parties 2.3 (b) (1980); Uniform Juvenile Court Act § 26 (a), 9A U. L. A. 35 (1979); National Council on Crime and Delinquency, Model Rules for Juvenile Courts, Rule 39 (1969); U. S. Dept. of HEW, Children's Bureau, Legislative Guide for Drafting Family and Juvenile Court Acts § 25 (b) (1969); U. S. Dept. of HEW, Children's Bureau, Legislative Guides for the Termination of Parental Rights and Responsibilities and the Adoption of Children, Pt. II, § 8 (1961); National Council on Crime and Delinquency, Standard Juvenile Court Act § 19 (1959). Most significantly, 33 States and the District of Columbia provide statutorily for the appointment of counsel in termination cases. The Court's opinion today in no way implies that the standards increasingly urged by informed public opinion and now widely followed by the States are other than enlightened and wise.

For the reasons stated in this opinion, the judgment is affirmed.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion and add only a few words to emphasize a factor I believe is misconceived by the dissenters. The purpose of the termination proceeding at issue here was not "punitive." *Post,* at 48. On the contrary, its purpose was *protective* of the child's best interests. Given the record in this case, which involves the parental rights of a mother under lengthy sentence for murder who showed little interest in her son, the writ might well have been a "candidate" for dismissal as improvidently granted. See *ante,* at 32–33. However, I am content to join the narrow holding of the Court, leaving the appointment of counsel in termination

proceedings to be determined by the state courts on a case-by-case basis.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court today denies an indigent mother the representation of counsel in a judicial proceeding initiated by the State of North Carolina to terminate her parental rights with respect to her youngest child. The Court most appropriately recognizes that the mother's interest is a "commanding one," *ante,* at 27, and it finds no countervailing state interest of even remotely comparable significance, see *ante,* at 27–28, 31. Nonetheless, the Court avoids what seems to me the obvious conclusion that due process requires the presence of counsel for a parent threatened with judicial termination of parental rights, and, instead, revives an ad hoc approach thoroughly discredited nearly 20 years ago in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963). Because I believe that the unique importance of a parent's interest in the care and custody of his or her child cannot constitutionally be extinguished through formal judicial proceedings without the benefit of counsel, I dissent.

## I

This Court is not unfamiliar with the problem of determining under what circumstances legal representation is mandated by the Constitution. In *Betts* v. *Brady,* 316 U. S. 455 (1942), it reviewed at length both the tradition behind the Sixth Amendment right to counsel in criminal trials and the historical practices of the States in that area. The decision in *Betts*—that the Sixth Amendment right to counsel did not apply to the States and that the due process guarantee of the Fourteenth Amendment permitted a flexible, case-by-case determination of the defendant's need for counsel in state criminal trials—was overruled in *Gideon* v. *Wainwright,* 372 U. S., at 345. The Court in *Gideon* rejected the *Betts*

reasoning to the effect that counsel for indigent criminal defendants was " 'not a fundamental right, essential to a fair trial.' " 372 U. S., at 340 (quoting *Betts* v. *Brady,* 316 U. S., at 471). Finding the right well founded in its precedents, the Court further concluded that "reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." 372 U. S., at 344. Similarly, in *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972), assistance of counsel was found to be a requisite under the Sixth Amendment, as incorporated into the Fourteenth, even for a misdemeanor offense punishable by imprisonment for less than six months.[1]

Outside the criminal context, however, the Court has relied on the flexible nature of the due process guarantee whenever it has decided that counsel is not constitutionally required. The special purposes of probation revocation determinations, and the informal nature of those administrative proceedings, including the absence of counsel for the State, led the Court to conclude that due process does not require counsel for probationers. *Gagnon* v. *Scarpelli,* 411 U. S. 778, 785–789 (1973). In the case of school disciplinary proceedings, which are brief, informal, and intended in part to be educative, the Court also found no requirement for legal counsel. *Goss* v. *Lopez,* 419 U. S. 565, 583 (1975). Most recently, the Court declined to intrude the presence of counsel for a minor facing voluntary civil commitment by his parent, because of the parent's substantial role in that decision and because of the decision's essentially medical and informal nature. *Parham* v. *J. R.,* 442 U. S. 584, 604–609 (1979).

In each of these instances, the Court has recognized that

---

[1] In *Scott* v. *Illinois,* 440 U. S. 367 (1979), the Court's analysis of Sixth Amendment jurisprudence led to the conclusion that the right to counsel is not constitutionally mandated when imprisonment is not actually imposed.

what process is due varies in relation to the interests at stake and the nature of the governmental proceedings. Where the individual's liberty interest is of diminished or less than fundamental stature, or where the prescribed procedure involves informal decisionmaking without the trappings of an adversarial trial-type proceeding, counsel has not been a requisite of due process. Implicit in this analysis is the fact that the contrary conclusion sometimes may be warranted. Where an individual's liberty interest assumes sufficiently weighty constitutional significance, and the State by a formal and adversarial proceeding seeks to curtail that interest, the right to counsel may be necessary to ensure fundamental fairness. See *In re Gault,* 387 U. S. 1 (1967). To say this is simply to acknowledge that due process allows for the adoption of different rules to address different situations or contexts.

It is not disputed that state intervention to terminate the relationship between petitioner and her child must be accomplished by procedures meeting the requisites of the Due Process Clause. Nor is there any doubt here about the kind of procedure North Carolina has prescribed. North Carolina law requires notice and a trial-type hearing before the State on its own initiative may sever the bonds of parenthood. The decisionmaker is a judge, the rules of evidence are in force, and the State is represented by counsel. The question, then, is whether proceedings in this mold, that relate to a subject so vital, can comport with fundamental fairness when the defendant parent remains unrepresented by counsel. As the Court today properly acknowledges, our consideration of the process due in this context, as in others, must rely on a balancing of the competing private and public interests, an approach succinctly described in *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976).[2] As does the majority, I

---

[2] See also *Little* v. *Streater, ante,* at 5–6, 13–16; *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 848–849 (1977); *Morrissey* v. *Brewer,*

evaluate the "three distinct factors" specified in *Eldridge:* the private interest affected; the risk of error under the procedure employed by the State; and the countervailing governmental interest in support of the challenged procedure.

## A

At stake here is "the interest of a parent in the companionship, care, custody, and management of his or her children." *Stanley* v. *Illinois,* 405 U. S. 645, 651 (1972). This interest occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. "[F]ar more precious . . . than property rights," *May* v. *Anderson,* 345 U. S. 528, 533 (1953), parental rights have been deemed to be among those "essential to the orderly pursuit of happiness by free men," *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923), and to be more significant and priceless than " 'liberties which derive merely from shifting economic arrangements.' " *Stanley* v. *Illinois,* 405 U. S., at 651, quoting *Kovacs* v. *Cooper,* 336 U. S. 77, 95 (1949) (Frankfurter, J., concurring). Accordingly, although the Constitution is verbally silent on the specific subject of families, freedom of personal choice in matters of family life long has been viewed as a fundamental liberty interest worthy of protection under the Fourteenth Amendment. *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 845 (1977); *Moore* v. *East Cleveland,* 431 U. S. 494, 499 (1977) (plurality opinion); *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (1944); *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); *Meyer* v. *Nebraska,* 262 U. S., at 399. Within the general ambit of family integrity, the Court has accorded a high degree of constitutional respect to a natural parent's interest both in controlling the details of the child's upbring-

408 U. S. 471, 481 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254, 262–263 (1970); *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961).

ing, *Wisconsin* v. *Yoder,* 406 U. S. 205, 232–234 (1972); *Pierce* v. *Society of Sisters,* 268 U. S., at 534–535, and in retaining the custody and companionship of the child, *Smith* v. *Organization of Foster Families,* 431 U. S., at 842–847; *Stanley* v. *Illinois,* 405 U. S., at 651.

In this case, the State's aim is not simply to influence the parent-child relationship but to *extinguish* it. A termination of parental rights is both total and irrevocable.[3] Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child, to participate in, or even to know about, any important decision affecting the child's religious, educational, emotional, or physical development. It is hardly surprising that this forced dissolution of the parent-child relationship has been recognized as a punitive sanction by courts,[4] Congress,[5] and commenta-

---

[3] Under North Carolina law, when a child is adjudged to be abused, neglected, or dependent, the dispositional alternatives are not couched in terms of permanence. See N. C. Gen. Stat. §§ 7A–647, 7A–651 (Supp. 1979). In contrast, the State's termination statute specifically provides that an order terminating parental rights "completely and permanently terminates all rights and obligations" between parent and child, except that the child's right of inheritance continues until such time as the child may be adopted. § 7A–289.33. Such absolute and total termination is not unusual. See, *e. g.,* Ariz. Rev. Stat. Ann. § 8–539 (1974); Cal. Civ. Code Ann. § 232.6 (West Supp. 1981); Ind. Code § 31–6–5–6 (a) (Supp. 1980); Ky. Rev. Stat. § 199.613 (2) (Supp. 1980); Mo. Rev. Stat. § 211.482 (Supp. 1980).

[4] *E. g., Davis* v. *Page,* 640 F. 2d 599, 604 (CA5 1981) (en banc); *Brown* v. *Guy,* 476 F. Supp. 771, 773 (Nev. 1979); *State ex rel. Lemaster* v. *Oakley,* 157 W. Va. 590, 598, 203 S. E. 2d 140, 144 (1974); *Danforth* v. *State Dept. of Health & Welfare,* 303 A. 2d 794, 799–800 (Me. 1973); *In re Howard,* 382 So. 2d 194, 199 (La. App. 1980).

[5] See H. R. Rep. No. 95–1386, p. 22 (1978) ("removal of a child from the parents is a penalty as great, if not greater, than a criminal penalty . . ."). This Report accompanied the Indian Child Welfare Act of 1978, Pub. L. 95–608, 92 Stat. 3069. Congress there provided for court-appointed counsel to indigent Indian parents facing a termination pro-

tors.[6]   The Court candidly notes, as it must, *ante,* at 27, that termination of parental rights by the State is a "unique kind of deprivation."

The magnitude of this deprivation is of critical significance in the due process calculus, for the process to which an individual is entitled is in part determined "by the extent to which he may be 'condemned to suffer grievous loss.'"   *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970), quoting *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring).   See *Little* v. *Streater, ante,* at 12; *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). Surely there can be few losses more grievous than the abrogation of parental rights.   Yet the Court today asserts that this deprivation somehow is less serious than threatened losses deemed to require appointed counsel, because in this instance the parent's own "personal liberty" is not at stake.

I do not believe that our cases support the "presumption" asserted, *ante,* at 26–27, that physical confinement is the only loss of liberty grievous enough to trigger a right to appointed counsel under the Due Process Clause.   Indeed, incarceration has been found to be neither a necessary nor a sufficient condition for requiring counsel on behalf of an indigent defendant.   The prospect of canceled parole or probation, with its consequent deprivation of personal liberty, has not led the Court to require counsel for a prisoner facing a revocation proceeding.   *Gagnon* v. *Scarpelli,* 411 U. S., at 785–789; *Morrissey* v. *Brewer,* 408 U. S., at 489.   On the other hand, the fact that no new incarceration was threatened by a transfer from prison to a mental hospital did not preclude the Court's recognition of adverse changes in the conditions of

---

ceeding.   § 102 (b), 92 Stat. 3071, 25 U. S. C. § 1911 (b) (1976 ed., Supp. III).

[6] See, *e. g.,* Levine, Caveat Parens: A Demystification of the Child Protection System, 35 U. Pitt. L. Rev. 1, 52 (1973); Note, Child Neglect: Due Process for the Parent, 70 Colum. L. Rev. 465, 478 (1970); Representation in Child-Neglect Cases: Are Parents Neglected?, 4 Colum. J. L. & Soc. Prob. 230, 250 (1968) (Parent Representation Study).

confinement and of the stigma that presumably is associated with being labeled mentally ill. *Vitek* v. *Jones,* 445 U. S. 480, 492, 494 (1980). For four Members of the Court, these "other deprivations of liberty," coupled with the possibly diminished mental capacity of the prisoner, compelled the provision of counsel for any indigent prisoner facing a transfer hearing. *Id.,* at 496–497 (opinion of WHITE, J., joined by BRENNAN, MARSHALL, and STEVENS, JJ.).[7] See also *In re Gault,* 387 U. S., at 24–25.

Moreover, the Court's recourse to a "pre-eminent generalization," *ante,* at 25, misrepresents the importance of our flexible approach to due process. That approach consistently has emphasized attentiveness to the particular context. Once an individual interest is deemed sufficiently substantial or fundamental, determining the constitutional necessity of a requested procedural protection requires that we examine the nature of the proceeding—both the risk of error if the protection is not provided and the burdens created by its imposition.[8] Compare *Goldberg* v. *Kelly,* 397 U. S. 254 (1970),

---

[7] JUSTICE POWELL agreed with the plurality that independent representation must be provided to an inmate facing involuntary transfer to a state mental hospital, but concluded that this representative need not be an attorney because the transfer hearing was informal and the central issue was a medical one. 445 U. S., at 498–500.

[8] By emphasizing the value of physical liberty to the exclusion of all other fundamental interests, the Court today grafts an unnecessary and burdensome new layer of analysis onto its traditional three-factor balancing test. Apart from improperly conflating two distinct lines of prior cases, see *supra,* at 35–38, the Court's reliance on a "rebuttable presumption" sets a dangerous precedent that may undermine objective judicial review regarding other procedural protections. Even in the area of juvenile court delinquency proceedings, where the threat of incarceration arguably supports an automatic analogy to the criminal process, the Court has eschewed a bright-line approach. Instead, it has evaluated each requested procedural protection in light of its consequences for fair play and truth determination. See generally *McKeiver* v. *Pennsylvania,* 403 U. S. 528 (1971); *In re Winship,* 397 U. S. 358 (1970); *In re Gault,* 387 U. S. 1 (1967).

with *Mathews* v. *Eldridge,* 424 U. S. 319 (1976), and *Fuentes* v. *Shevin,* 407 U. S. 67 (1972), with *Mitchell* v. *W. T. Grant Co.,* 416 U. S. 600 (1974).

Rather than opting for the insensitive presumption that incarceration is the only loss of liberty sufficiently onerous to justify a right to appointed counsel, I would abide by the Court's enduring commitment to examine the relationships among the interests on both sides, and the appropriateness of counsel in the specific type of proceeding. The fundamental significance of the liberty interests at stake in a parental termination proceeding is undeniable, and I would find this first portion of the due process balance weighing heavily in favor of refined procedural protections. The second *Eldridge* factor, namely, the risk of error in the procedure provided by the State, must then be reviewed with some care.

## B

The method chosen by North Carolina to extinguish parental rights resembles in many respects a criminal prosecution. Unlike the probation revocation procedure reviewed in *Gagnon* v. *Scarpelli,* on which the Court so heavily relies, the termination procedure is distinctly formal and adversarial. The State initiates the proceeding by filing a petition in district court, N. C. Gen. Stat. §§ 7A–289.23 and 7A–289.25 (Supp. 1979),[9] and serving a summons on the parent, § 7A–289.27 (1). A state judge presides over the adjudicatory hearing that follows, and the hearing is conducted pursuant to the formal rules of evidence and procedure. N. C. Rule Civ. Proc. 1, N. C. Gen. Stat. § 1A–1 (Supp. 1979). In gen-

---

[9] A petition for termination may also be filed by a private party, such as a judicially appointed guardian, a foster parent, or the other natural parent. N. C. Gen. Stat. § 7A–289.24 (Supp. 1979). Because the State in those circumstances may not be performing the same adversarial and accusatory role, an application of the three *Eldridge* factors might yield a different result with respect to the right to counsel.

eral, hearsay is inadmissible and records must be authenticated. See, *e. g.,* § 1A–1, Rules 1, 43, 44, 46.

In addition, the proceeding has an obvious accusatory and punitive focus. In moving to terminate a parent's rights, the State has concluded that it no longer will try to preserve the family unit, but instead will marshal an array of public resources to establish that the parent-child separation must be made permanent.[10] The State has legal representation through the county attorney. This lawyer has access to public records concerning the family and to professional social workers who are empowered to investigate the family situation and to testify against the parent. The State's legal representative may also call upon experts in family relations, psychology, and medicine to bolster the State's case. And, of course, the State's counsel himself is an expert in the legal standards and techniques employed at the termination proceeding, including the methods of cross-examination.

_____

[10] Significantly, the parent's rights and interests are not mentioned at all under the statement of purpose for the North Carolina termination statute. See N. C. Gen. Stat. § 7A–289.22 (Supp. 1979). In contrast, in abuse, neglect, and dependency proceedings the State has a statutory obligation to keep a family together whenever possible. § 7A–542. Thus, the State has chosen to provide counsel for parents, § 7A–587, in circumstances where it shares at least in part their interest in family integrity but not where it regards the parent as an opponent. The Assistant Attorney General of North Carolina explained the decision to furnish appointed counsel at the abuse and neglect stage by pointing to the State's need to avoid an awkward situation, given its possibly conflicting responsibilities to parent and child. Tr. of Oral Arg. 39–40. While this may be sound as a matter of public policy, it cannot excuse the failure to provide counsel at the termination stage, where the State and the indigent parent are adversaries, and the inequality of power and resources is starkly evident.

The possibility of providing counsel for the *child* at the termination proceeding has not been raised by the parties. That prospect requires consideration of interests different from those presented here, and again might yield a different result with respect to the right to counsel. See generally *Parham* v. *J. R.,* 442 U. S. 584 (1979); *Smith* v. *Organization of Foster Families,* 431 U. S. 816 (1977).

In each of these respects, the procedure devised by the State vastly differs from the informal and rehabilitative probation revocation decision in *Scarpelli,* the brief, educative school disciplinary procedure in *Goss,* and the essentially medical decision in *Parham.* Indeed, the State here has prescribed virtually all the attributes of a formal trial as befits the severity of the loss at stake in the termination decision—every attribute, that is, except counsel for the defendant parent. The provision of counsel for the parent would not alter the character of the proceeding, which is already adversarial, formal, and quintessentially legal. It, however, would diminish the prospect of an erroneous termination, a prospect that is inherently substantial, given the gross disparity in power and resources between the State and the uncounseled indigent parent.[11]

The prospect of error is enhanced in light of the legal standard against which the defendant parent is judged. As demonstrated here, that standard commonly adds another dimension to the complexity of the termination proceeding. Rather than focusing on the facts of isolated acts or omissions, the State's charges typically address the nature and quality of complicated ongoing relationships among parent, child, other relatives, and even unrelated parties. In the case at bar, the State's petition accused petitioner of two of the several grounds authorizing termination of parental rights under North Carolina law:

> "That [petitioner] has *without cause,* failed to establish or maintain *concern or responsibility* as to the child's welfare.
>
> .    .    .    .    .
>
> "That [petitioner] has *willfully* left the child in foster care for more than two consecutive years without show-

---

[11] Cf. *Parham* v. *J. R.,* 442 U. S., at 606–607; *Goldberg* v. *Kelly,* 397 U. S., at 266.

ing that *substantial progress has been made* in correcting the conditions which led to the removal of the child [for neglect], or without showing a *positive response* to the *diligent efforts of the Department of Social Services* to strengthen her relationship to the child, or *to make and follow through with constructive planning* for the future of the child." (Emphasis supplied.) Juvenile Petition ¶¶ 6, 7, App. 3.[12]

The legal issues posed by the State's petition are neither simple nor easily defined. The standard is imprecise and open to the subjective values of the judge.[13] A parent seeking to prevail against the State must be prepared to adduce evidence about his or her personal abilities and lack of fault, as well as proof of progress and foresight as a parent that the State would deem adequate and improved over the situation underlying a previous adverse judgment of child neglect. The parent cannot possibly succeed without being able to identify material issues, develop defenses, gather and present

---

[12] See N. C. Gen. Stat. §§ 7A–289.32 (1), 7A–289.32 (3) (Supp. 1977). Subdivision § 7A–289.32 (1) was repealed by 1979 N. C. Sess. Laws, ch. 669, § 2.

[13] Under North Carolina law, there is a further stage to the termination inquiry. Should the trial court determine that one or more of the conditions authorizing termination has been established, it then must consider whether the best interests of the child require maintenance of the parent-child relationship. N. C. Gen. Stat. § 7A–289.31 (a) (Supp. 1979).

This Court more than once has adverted to the fact that the "best interests of the child" standard offers little guidance to judges, and may effectively encourage them to rely on their own personal values. See, *e. g., Smith* v. *Organization of Foster Families,* 431 U. S., at 835, n. 36; *Bellotti* v. *Baird,* 443 U. S. 622, 655 (1979) (STEVENS, J., concurring in judgment). See also *Quilloin* v. *Walcott,* 434 U. S. 246, 255 (1978). Several courts, perceiving similar risks, have gone so far as to invalidate parental termination statutes on vagueness grounds. See, *e. g., Alsager* v. *District Court of Polk Cty.,* 406 F. Supp. 10, 18–19 (SD Iowa 1975), aff'd on other grounds, 545 F. 2d 1137 (CA8 1976); *Davis* v. *Smith,* 266 Ark. 112, 121–123, 583 S. W. 2d 37, 42–43 (1979).

sufficient supporting nonhearsay evidence, and conduct cross-examination of adverse witnesses.

The Court, of course, acknowledges, *ante,* at 30, that these tasks "may combine to overwhelm an uncounseled parent." I submit that that is a profound understatement. Faced with a formal accusatory adjudication, with an adversary— the State—that commands great investigative and prosecutorial resources, with standards that involve ill-defined notions of fault and adequate parenting, and with the inevitable tendency of a court to apply subjective values or to defer to the State's "expertise," the defendant parent plainly is outstripped if he or she is without the assistance of " 'the guiding hand of counsel.' " *In re Gault,* 387 U. S., at 36, quoting *Powell* v. *Alabama,* 287 U. S. 45, 69 (1932). When the parent is indigent, lacking in education, and easily intimidated by figures of authority,[14] the imbalance may well become insuperable.

The risk of error thus is severalfold. The parent who actually has achieved the improvement or quality of parenting the State would require may be unable to establish this fact. The parent who has failed in these regards may be unable to demonstrate cause, absence of willfulness, or lack of agency diligence as justification. And errors of fact or law in the State's case may go unchallenged and uncorrected.[15] Given

---

[14] See Schetky, Angell, Morrison, & Sack, Parents Who Fail: A Study of 51 Cases of Termination of Parental Rights, 18 J. Am. Acad. Child Psych. 366, 375 (1979) (citing minimal educational backgrounds). See also *Davis* v. *Page,* 442 F. Supp. 258, 260 (SD Fla. 1977) (uncounseled parent, ignorant of governing substantive law, "was little more than a spectator in the adjudicatory [dependency] proceeding," and "sat silently through most of the hearing . . . fearful of antagonizing the social workers"), aff'd in part, 640 F. 2d 599 (CA5 1981) (en banc).

[15] See Parent Representation Study, at 241 (parents appearing in Kings County, N. Y., Family Court, charged with neglect and represented by counsel, had higher rate of dismissed petitions, 25% to 7.9%, and lower rate of neglect adjudications, 62.5% to 79.5%, than similarly charged parents appearing without counsel); Brief for Respondent 38–39, 25a–31a

the weight of the interests at stake, this risk of error assumes extraordinary proportions. By intimidation, inarticulateness, or confusion, a parent can lose forever all contact and involvement with his or her offspring.

## C

The final factor to be considered, the interests claimed for the State, do not tip the scale against providing appointed counsel in this context. The State hardly is in a position to assert here that it seeks the informality of a rehabilitative or educative proceeding into which counsel for the parent would inject an unwelcome adversarial edge. As the Assistant Attorney General of North Carolina declared before this Court, once the State moves for termination, it "has made a decision that the child cannot go home and should not go home. It no longer has an obligation to try and restore that family." Tr. of Oral Arg. 40.

The State may, and does, properly assert a legitimate interest in promoting the physical and emotional well-being of its minor children. But this interest is not served by terminating the rights of any concerned, responsible parent. Indeed, because North Carolina is committed to "protect-[ing] all children from the unnecessary severance of a relationship with biological or legal parents," § 7A–289.22 (2), "the State spites its own articulated goals when it needlessly

---

(study of state-initiated termination actions in 73 North Carolina counties; parent prevailed in 5.5% of proceedings where represented by counsel, and in 0.15% of proceedings where unrepresented).

While these statistics hardly are dispositive, I do not share the Court's view, *ante,* at 29–30, n. 5, that they are "unilluminating." Since no evidence in either study indicates that the defendant parent who can retain or is offered counsel is less culpable than the one who appears unrepresented, it seems reasonable to infer that a sizable number of cases against unrepresented parents end in termination solely because of the absence of counsel. In addition, as the Court acknowledges, *ante,* at 30, n. 5, the judges who preside over termination hearings perceive them as less fair when the parent is without counsel.

separates" the parent from the child. *Stanley* v. *Illinois,* 405 U. S., at 653.[16]

The State also has an interest in avoiding the cost and administrative inconvenience that might accompany a right to appointed counsel. But, as the Court acknowledges, the State's fiscal interest "is hardly significant enough to overcome private interests as important as those here." *Ante,* at 28. The State's financial concern indeed is a limited one, for the right to appointed counsel may well be restricted to those termination proceedings that are instituted by the State. Moreover, no difficult line-drawing problem would arise with respect to other types of civil proceedings. The instant due process analysis takes full account of the fundamental nature of the parental interest, the permanency of the threatened deprivation, the gross imbalance between the resources employed by the prosecuting State and those available to the indigent parent, and the relatively insubstantial cost of furnishing counsel. An absence of any one of these factors might yield a different result.[17] But where, as here, the threatened loss of liberty is severe and absolute, the State's role is so clearly adversarial and punitive, and the cost involved is relatively slight, there is no sound basis for refusing to recognize the right to counsel as a requisite of due process in a proceeding initiated by the State to terminate parental rights.

## II

### A

The Court's analysis is markedly similar to mine; it, too, analyzes the three factors listed in *Mathews* v. *Eldridge,* and it, too, finds the private interest weighty, the procedure devised by the State fraught with risks of error, and the coun-

---

[16] The Court apparently shares this view. See *ante,* at 27–28.

[17] Thus, for example, the State's involvement in adjudicating the competing claims for child custody between parents in a divorce proceeding need not obligate it to provide counsel for indigent parents.

tervailing governmental interest insubstantial. Yet, rather than follow this balancing process to its logical conclusion, the Court abruptly pulls back and announces that a defendant parent must await a case-by-case determination of his or her need for counsel. Because the three factors "will not *always* be so distributed," reasons the Court, the Constitution should not be read to "requir[e] the appointment of counsel in *every* parental termination proceeding." *Ante,* at 31 (emphasis added). This conclusion is not only illogical, but it also marks a sharp departure from the due process analysis consistently applied heretofore. The flexibility of due process, the Court has held, requires case-by-case consideration of different decisionmaking *contexts,* not of different *litigants* within a given context. In analyzing the nature of the private and governmental interests at stake, along with the risk of error, the Court in the past has not limited itself to the particular case at hand. Instead, after addressing the three factors as generic elements in the context raised by the particular case, the Court then has formulated a rule that has general application to similarly situated cases.

The Court's own precedents make this clear. In *Goldberg* v. *Kelly,* the Court found that the desperate economic conditions experienced by welfare recipients *as a class* distinguished them from other recipients of governmental benefits. 397 U. S., at 264. In *Mathews* v. *Eldridge,* the Court concluded that the needs of Social Security disability recipients were *not* of comparable urgency, and, moreover, that existing pretermination procedures, based largely on written medical assessments, were likely to be more objective and even-handed than typical welfare entitlement decisions. 424 U. S., at 339–345. These cases established rules translating due process in the welfare context as requiring a pretermination hearing but dispensing with that requirement in the disability benefit context. A showing that a particular welfare recipient had access to additional income, or that a disability recipient's eligibility turned on testimony rather than

written medical reports, would not result in an exception from the required procedural norms. The Court reasoned in *Eldridge:*

"To be sure, credibility and veracity may be a factor in the ultimate disability assessment in some cases. But procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Id.,* at 344.

There are sound reasons for this. Procedural norms are devised to ensure that justice may be done in every case, and to protect litigants against unpredictable and unchecked adverse governmental action. Through experience with decisions in varied situations over time, lessons emerge that reflect a general understanding as to what is minimally necessary to assure fair play. Such lessons are best expressed to have general application which guarantees the predictability and uniformity that underlie our society's commitment to the rule of law. By endorsing, instead, a retrospective review of the trial record of each particular defendant parent, the Court today undermines the very rationale on which this concept of general fairness is based.[18]

Moreover, the case-by-case approach advanced by the Court itself entails serious dangers for the interests at stake and the general administration of justice. The Court assumes that a review of the record will establish whether a defendant, proceeding without counsel, has suffered an un-

---

[18] The Court's decision in *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), is not to the contrary. In *Scarpelli,* the Court determined that due process requires an individualized approach to requests for counsel by probationers facing revocation. The rule established there was based on respect for the rehabilitative focus of the probation system, the informality of probation proceedings, and the diminished liberty interest of an already-convicted probationer. *Id,* at 785–789. None of these elements is present here. See also *Wolff* v. *McDonnell,* 418 U. S. 539, 569–570 (1974).

fair disadvantage. But in the ordinary case, this simply is not so. The pleadings and transcript of an uncounseled termination proceeding at most will show the obvious blunders and omissions of the defendant parent. Determining the difference legal representation would have made becomes possible only through imagination, investigation, and legal research focused on the particular case. Even if the reviewing court can embark on such an enterprise in each case, it might be hard pressed to discern the significance of failures to challenge the State's evidence or to develop a satisfactory defense. Such failures, however, often cut to the essence of the fairness of the trial, and a court's inability to compensate for them effectively eviscerates the presumption of innocence. Because a parent acting *pro se* is even more likely to be unaware of controlling legal standards and practices, and unskilled in garnering relevant facts, it is difficult, if not impossible, to conclude that the typical case has been adequately presented. Cf. *Betts* v. *Brady,* 316 U. S., at 476 (dissenting opinion).[19]

Assuming that this ad hoc review were adequate to ensure fairness, it is likely to be both cumbersome and costly. And because such review involves constitutional rights implicated by state adjudications, it necessarily will result in increased federal interference in state proceedings. The Court's implication to the contrary, see *ante,* at 33, is belied by the Court's experience in the aftermath of *Betts* v. *Brady.* The Court was confronted with innumerable postverdict challenges to the fairness of particular trials, and expended much

---

[19] Of course, the case-by-case approach announced by the Court today places an even heavier burden on the trial court, which will be required to determine in advance what difference legal representation might make. A trial judge will be obligated to examine the State's documentary and testimonial evidence well before the hearing so as to reach an informed decision about the need for counsel in time to allow adequate preparation of the parent's case.

energy in effect evaluating the performance of state judges.[20] This level of intervention in the criminal processes of the States prompted Justice Frankfurter, speaking for himself and two others, to complain that the Court was performing as a "super-legal-aid bureau." *Uveges* v. *Pennsylvania,* 335 U. S. 437, 450 (1948) (dissenting opinion). I fear that the decision today may transform the Court into a "super family court."

### B

The problem of inadequate representation is painfully apparent in the present case. Petitioner, Abby Gail Lassiter, is the mother of five children. The State moved to remove the fifth child, William, from petitioner's care on the grounds of parental neglect. Although petitioner received notice of the removal proceeding, she did not appear at the hearing and was not represented. In May 1975, the State's District Court adjudicated William to be neglected under North Carolina law and placed him in the custody of the Durham County Department of Social Services. At some point, petitioner evidently arranged for the other four children to reside with and be cared for by her mother, Mrs. Lucille Lassiter. They remain under their grandmother's care at the present time.

As the Court notes, *ante,* at 22, petitioner did not visit William after July 1976. She was unable to do so, for she was imprisoned as a result of her conviction for second-degree murder. In December 1977, she was visited in prison by a Durham County social worker who advised her that the Department planned to terminate her parental rights with respect to William. Petitioner immediately expressed strong

---

[20] See, *e. g., Quicksall* v. *Michigan,* 339 U. S. 660 (1950); *Uveges* v. *Pennsylvania,* 335 U. S. 437 (1948); *Bute* v. *Illinois,* 333 U. S. 640 (1948); *Marino* v. *Ragen,* 332 U. S. 561 (1947); *Hawk* v. *Olson,* 326 U. S. 271 (1945); *Tomkins* v. *Missouri,* 323 U. S. 485 (1945). See generally W. Beaney, The Right to Counsel in American Courts 160–198 (1955).

opposition to that plan and indicated a desire to place the child with his grandmother. Hearing Tr. 15. After receiving a summons, a copy of the State's termination petition, and notice that a termination hearing would be held in August 1978, petitioner informed her prison guards about the legal proceeding. They took no steps to assist her in obtaining legal representation, *id.*, at 4; App. I to Reply to Brief in Opposition 4, nor was she informed that she had a right to counsel.[21] Under these circumstances, it scarcely would be appropriate, or fair, to find that petitioner had knowingly and intelligently waived a right to counsel.

At the termination hearing, the State's sole witness was the county worker who had met petitioner on the one occasion at the prison. This worker had been assigned to William's case in August 1977, yet much of her testimony concerned events prior to that date; she represented these events as contained in the agency record. Hearing Tr. 10–13. Petitioner failed to uncover this weakness in the worker's testimony. That is hardly surprising, for there is no indication that an agency record was introduced into evidence or was present in court, or that petitioner or the grandmother ever had an opportunity to review any such record. The social worker also testified about her conversations with members of the community. In this hearsay testimony, the witness reported the opinion of others that the grandmother could not handle the additional responsibility of caring for the fifth child. *Id.*, at 14–15. There is no indication that these community members were unavailable to testify, and the County Attorney did not justify the admission of the hearsay. Petitioner made no objection to its admission.

---

[21] During her imprisonment, petitioner had spoken with an attorney concerning her criminal conviction. She did not discuss the termination proceeding with this lawyer, and he has stated under oath that in view of her indigency he would not have been interested in representing her at that proceeding even had she asked him to do so. App. 10–11, 16.

54

The court gave petitioner an opportunity to cross-examine the social worker, *id.*, at 19, but she apparently did not understand that cross-examination required questioning rather than declarative statements. At this point, the judge became noticeably impatient with petitioner.[22] Petitioner then

[22] Hearing Tr. 19–20:

"THE COURT: All right. Do you want to ask her any questions?

"[PETITIONER]: About what? About what she—

"THE COURT: About this child.

"[PETITIONER]: Oh, yes.

"THE COURT: All right. Go ahead.

"[PETITIONER]: The only thing I know is that when you say—

"THE COURT: I don't want you to testify.

"[PETITIONER]: Okay.

"THE COURT: I want to know whether you want to cross-examine her or ask any questions.

"[PETITIONER]: Yes, I want to. Well, you know, the only thing I know about is my part that I know about it. I know—

"THE COURT: I am not talking about what you know. I want to know if you want to ask her any questions or not.

"[PETITIONER]: About that?

"THE COURT: Yes. Do you understand the nature of this proceeding?

"[PETITIONER]: Yes.

"THE COURT: And that is to terminate any rights you have to the child and place it for adoption, if necessary.

"[PETITIONER]: Yes, I know.

"THE COURT: Are there any questions you want to ask her about what she has testified to?

"[PETITIONER]: Yes.

"THE COURT: All right. Go ahead.

"[PETITIONER]: I want to know why you think you are going to turn my child over to a foster home? He knows my mother and he knows all of us. He knows her and he knows all of us.

"THE COURT: Who is he?

"[PETITIONER]: My son, William.

"[SOCIAL WORKER]: Ms. Lassiter, your son has been in foster care since May of 1975 and since that time—

"[PETITIONER]: Yeah, yeah and I didn't know anything about it either."

took the stand, and testified that she wanted William to live with his grandmother and his siblings. The judge questioned her for a brief period, and expressed open disbelief at one of her answers.[23] The final witness was the grandmother. Both the judge and the County Attorney questioned her. She denied having expressed unwillingness to take William into her home, and vehemently contradicted the social worker's statement that she had complained to the Department about her daughter's neglect of the child.[24] Petitioner was not told that she could question her mother, and did not do so.[25] The County Attorney made a closing argument, *id.*, at 58–60,

---

[23] *Id.*, at 30:

"[THE COURT]: Did you know that your mother filed a complaint on the 8th day of May, 1975 . . . . ?

"A: No, 'cause she said she didn't file no complaint.

"[THE COURT]: That was some ghost who came up here and filed it I suppose."

The judge concluded his questioning by saying to the County Attorney: "All right, Mr. Odom, see what you can do." *Id.*, at 36.

[24] This latter denial produced the following reaction from the court, *id.*, at 55:

"Q [from respondent]: Did you tell Ms. Mangum on the 8th day of May, 1975, that when your daughter was in the hospital having William that she left the children in the cold house with no heat?

"A: No, sir, no, sir, unh unh, no, sir.

"[PETITIONER]: That's a lie.

"A: No, sir, no, sir. God knows, I'll raise my right hand to God and die saying that. Somebody else told that.

"THE COURT: I wish you wouldn't talk like that it scares me to be in the same room with you."

[25] The judge had initiated the examination of Mrs. Lassiter; subsequently he expressed exasperation with the rambling quality of her answers, *id.*, at 52:

"THE COURT: I tell you what, let's just stop all this. You question her, please. Just answer his questions. We'll be here all day at this rate. I mean, we are just wasting time, we're skipping from one subject to another—

"CROSS EXAMINATION BY [RESPONDENT]; . . . ."

and the judge then asked petitioner if she had any final remarks. She responded: "Yes. I don't think its right." *Id.,* at 61.

It is perhaps understandable that the District Court Judge experienced difficulty and exasperation in conducting this hearing. But both the difficulty and the exasperation are attributable in large measure, if not entirely, to the lack of counsel. An experienced attorney might have translated petitioner's reaction and emotion into several substantive legal arguments. The State charged petitioner with failing to arrange a "constructive plan" for her child's future or to demonstrate a "positive response" to the Department's intervention. A defense would have been that petitioner had arranged for the child to be cared for properly by his grandmother, and evidence might have been adduced to demonstrate the adequacy of the grandmother's care of the other children. See, *e. g., In re Valdez,* 29 Utah 2d 63, 504 P. 2d 1372 (1973); *Welfare Commissioner* v. *Anonymous,* 33 Conn. Supp. 100, 364 A. 2d 250 (1976); *Diernfeld* v. *People,* 137 Colo. 238, 323 P. 2d 628 (1958). See generally *Moore* v. *East Cleveland,* 431 U. S., at 504 (plurality opinion); *id.,* at 508–510 (opinion of BRENNAN, J.). The Department's own "diligence" in promoting the family's integrity was never put in issue during the hearing, yet it is surely significant in light of petitioner's incarceration and lack of access to her child. See, *e. g., Weaver* v. *Roanoke Dept. of Human Resources,* 220 Va. 921, 929, 265 S. E. 2d 692, 697 (1980); *In re Christopher H.,* 577 P. 2d 1292, 1294 (Okla. 1978); *In re Kimberly I.,* 72 App. Div. 2d 831, 833, 421 N. Y. S. 2d 649, 651 (1979). Finally, the asserted willfulness of petitioner's lack of concern could obviously have been attacked since she was physically unable to regain custody or perhaps even to receive meaningful visits during 21 of the 24 months preceding the action. Cf. *In re Dinsmore,* 36 N. C. App. 720, 245 S. E. 2d 386 (1978).

## III

Petitioner plainly has not led the life of the exemplary citizen or model parent. It may well be that if she were accorded competent legal representation, the ultimate result in this particular case would be the same. But the issue before the Court is not petitioner's character; it is whether she was given a meaningful opportunity to be heard when the State moved to terminate absolutely her parental rights.[26] In light of the unpursued avenues of defense, and of the experience petitioner underwent at the hearing, I find virtually incredible the Court's conclusion today that her termination proceeding was fundamentally fair. To reach that conclusion, the Court simply ignores the defendant's obvious inability to speak effectively for herself, a factor the Court has found to be highly significant in past cases. See *Gagnon* v. *Scarpelli*, 411 U. S., at 791; *Uveges* v. *Pennsylvania*, 335 U. S., at 441–442; *Bute* v. *Illinois*, 333 U. S. 640, 677 (1948). See also *Vitek* v. *Jones*, 445 U. S., at 496–497 (plurality opinion); *id.*, at 498 (opinion of POWELL, J.). I am unable to ignore that factor; instead, I believe that the record, and the norms of

---

[26] Unfortunately, the Court does not confine itself to the issue at hand. By going outside the official record of this case, *ante,* at 20–21, n. 1, to unearth and recite details of petitioner's second-degree murder conviction set forth in an unpublished state appellate opinion, see *State* v. *Lassiter,* 33 N. C. App. 405, 235 S. E. 2d 289 (1977); Rule 30 (e) (3), N. C. Rules of Appellate Procedure, N. C. Gen. Stat. (Supp. 1979 to vol. 4A), the Court apparently believes it has contributed evidence relevant to petitioner's fitness as a parent, and perhaps to the fitness of petitioner's mother as well. But while some States retain statutes permitting parental rights to be terminated upon a parent's criminal conviction, North Carolina is not among them. See N. C. Gen. Stat. § 7A–289.32 (Supp. 1979). See Note, On Prisoners and Parenting: Preserving the Tie that Binds, 87 Yale L. J. 1408, 1409–1410 (1978). Reliance on such evidence is likely to encourage the kind of subjective value judgments that an adversarial judicial proceeding is meant to avoid.

fairness acknowledged by the majority, compel a holding according counsel to petitioner and persons similarly situated.

Finally, I deem it not a little ironic that the Court on this very day *grants,* on due process grounds, an indigent putative father's claim for state-paid blood grouping tests in the interest of according him a meaningful opportunity to disprove his paternity, *Little* v. *Streater, ante,* p. 1, but in the present case *rejects,* on due process grounds, an indigent mother's claim for state-paid legal assistance when the State seeks to take her own child away from her in a termination proceeding. In *Little* v. *Streater,* the Court stresses and relies upon the need for "procedural fairness," the "compelling interest in the accuracy of [the] determination," the "not inconsiderable" risk of error, the indigent's "fac[ing] the State as an adversary," and "fundamental fairness," *ante,* at 13, 14, and 16.

There is some measure of inconsistency and tension here, it seems to me. I can attribute the distinction the Court draws only to a presumed difference between what it views as the "civil" and the "quasi-criminal," *Little* v. *Streater, ante,* at 10. Given the factual context of the two cases decided today, the significance of that presumed difference eludes me.

Ours, supposedly, is "a maturing society," *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion), and our notion of due process is, "perhaps, the least frozen concept of our law." *Griffin* v. *Illinois,* 351 U. S. 12, 20 (1956) (opinion concurring in judgment). If the Court in *Boddie* v. *Connecticut,* 401 U. S. 371 (1971), was able to perceive as constitutionally necessary the access to judicial resources required to dissolve a marriage at the behest of private parties, surely it should perceive as similarly necessary the requested access to legal resources when the State itself seeks to dissolve the intimate and personal family bonds between parent and child. It will not open the "floodgates" that, I suspect, the Court

fears. On the contrary, we cannot constitutionally afford the closure that the result in this sad case imposes upon us all.

I respectfully dissent.

JUSTICE STEVENS, dissenting.

A woman's misconduct may cause the State to take formal steps to deprive her of her liberty. The State may incarcerate her for a fixed term and also may permanently deprive her of her freedom to associate with her child. The former is a pure deprivation of liberty; the latter is a deprivation of both liberty and property, because statutory rights of inheritance as well as the natural relationship may be destroyed. Although both deprivations are serious, often the deprivation of parental rights will be the more grievous of the two. The plain language of the Fourteenth Amendment commands that both deprivations must be accompanied by due process of law.*

Without so stating explicitly, the Court appears to treat this case as though it merely involved the deprivation of an interest in property that is less worthy of protection than a person's liberty. The analysis employed in *Mathews* v. *Eldridge,* 424 U. S. 319, in which the Court balanced the costs and benefits of different procedural mechanisms for allocating a finite quantity of material resources among competing claimants, is an appropriate method of determining what process is due in property cases. Meeting the Court on its own terms, JUSTICE BLACKMUN demonstrates that the *Mathews* v. *Eldridge* analysis requires the appointment of counsel in this type of case. I agree with his conclusion, but I would take one further step.

In my opinion the reasons supporting the conclusion that the Due Process Clause of the Fourteenth Amendment en-

---

* The Fourteenth Amendment provides in part:

"No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."

titles the defendant in a criminal case to representation by counsel apply with equal force to a case of this kind. The issue is one of fundamental fairness, not of weighing the pecuniary costs against the societal benefits. Accordingly, even if the costs to the State were not relatively insignificant but rather were just as great as the costs of providing prosecutors, judges, and defense counsel to ensure the fairness of criminal proceedings, I would reach the same result in this category of cases. For the value of protecting our liberty from deprivation by the State without due process of law is priceless.