# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-1082

## STATE IN THE INTEREST OF Z.C.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 11-J-453
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Jimmie C. Peters, Marc T. Amy, and Shannon J. Gremillion, Judges.

AFFIRMED.

**J. Phillip Haney, District Attorney**
**Sixteenth Judicial District Court**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Barry L. LaCour**
**Mental Health Advocacy Service**
**302 Dulles Drive, Suite U-47**
**Lafayette, LA 70508**
**(337) 262-2030**
**COUNSEL FOR APPELLEE:**
        **Z.C. (child)**

**Tamara D. Rahim**
**Claude Amcar**
**Diane E. Cote**
**825 Kaliste Saloom Road**
**Brandywine 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-2250**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana, Department of Children and Family Services**

**Joseph A. Tabb**
**Aloise, Baudry & Tabb**
**111 Wilson Street**
**Franklin, LA 70538**
**(337) 828-0454**
**COUNSEL FOR APPELLANT:**
    **A.C. (mother)**

**GREMILLION, Judge.**

In this case, the mother, A.C., appeals the trial court's judgment terminating her parental rights to her child, Z.C., born January 29, 2007.[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2011, Z.C. was placed in the custody of the State of Louisiana, through the Department of Children and Family Services (DCFS), pursuant to an instanter order following a May 2011 report that Z.C. had been left in the care of his grandmother and his mother could not be found. The grandmother told investigators from DCFS that she and her husband often cared for Z.C., that Z.C. reported traveling to many different locations where lots of men were, and that he slept in beds with lots of people he did not know. The grandmother further stated that Z.C. told her that he witnessed his father, C.C., throw a knife at his mother.[2] The grandmother believed that her daughter was using drugs because she rarely ate, complained of itching, and an intercepted text message sent by A.C. in which she refers to "tweaking."[3] A drug screen of A.C. was positive for marijuana.

The petition to adjudicate Z.C. in need of care was based on the neglect of A.C., pursuant to La.Ch.Code art. 603(14). Z.C. was adjudicated in need of care in September 2011. Various case plans were instituted, and permanency hearings were held. The original case plan of June 2011, set forth various goals for reunification, including obtaining employment, undergoing a psychological

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, initials are used throughout to protect the identity of the minor.

[2] C.C.'s parental rights to Z.C. have been terminated and are not at issue in this appeal.

[3] Tweaking refers to being under the influence of methamphetamine.

evaluation, submitting to random drug screens, participating in substance abuse assessments and treatment, if necessary, and attending parenting classes.

At the first review hearing in December 2011, DCFS reports indicated that A.C. had not been compliant, because she had not maintained stable housing or employment. Custody was continued with the state.

The next report to the court submitted by DCFS, dated April 10, 2012, found that A.C. "has been compliant with pursing [sic] most of her case plan goals." A.C. found permanent employment in March 2012. DCFS determined that A.C. did not need substance abuse treatment but should attend Al-Anon meetings, which she had been doing. She completed an online parenting course. DCFS further reported that A.C. was cooperative with the weekly visitation schedule. The overall assessment was that A.C. was complying with some aspects of her case plan. Following an April 26, 2012 hearing, custody was maintained with the state.

The next report, dated September 19, 2012, found that A.C. had completed some of her case plan. The goal continued to be reunification with A.C. Following an October 3, 2012 hearing, custody was continued with the state.

Another hearing took place on December 20, 2012. This hearing report refers to a December 5, 2012 case plan, which is not in the record. This report states that "[A.C.] is no longer complying with her case plan." Custody was continued with the State.

A March 11, 2013 letter to the trial court indicated that the case-plan goal was adoption, because A.C. was no longer compliant with her case plan. A May 9, 2013 letter to the court from DCFS stated that the agency had offered A.C. the opportunity to have weekly weekend visits with Z.C., but that she had failed to cooperate with this and other parts of her case plan. This letter indicates that

2

adoption is the plan goal.[4]  The next report submitted by DCFS is dated May 13, 2013, and indicates that A.C. had not made any progress on her case plan since the last court hearing, primarily because of failure to keep in contact with the agency.[5] Following a May 22, 2013 permanency and case-review hearing, the trial court found that A.C. was no longer complying with her case plan and continued custody with the state.

An October 17, 2013 letter from DCFS to the trial court continued to note A.C. as non-compliant with her case plan and a goal for Z.C. of adoption. Following a November 7, 2013 hearing, the trial court issued a report finding that "Case plans goals are not being met. [A.C.] has not complied with any parts of her plan."  The trial court further determined that adoption would be the permanent plan for Z.C. and continued custody with the state.

The state filed a petition for termination of parental rights and certification for adoption in November 2013, claiming that the parents' rights should be terminated due to abandonment and failing to provide significant contributions to the child's care and support for any period for six consecutive months, pursuant to La.Ch.Code art. 1015(4).  Following a January 14, 2014 trial, A.C.'s parental rights to Z.C. were terminated.  A.C. filed a motion for new trial, which was denied on April 1, 2014.  A.C. now appeals.

**ISSUES**

1. The State of Louisiana failed to prove that there had not been substantial parental compliance with a case plan for services which has been previously been filed.

---

[4] This letter to the trial court was issued by a local DCFS office in New Iberia.

[5] This letter to the trial court was issued by a Lake Charles office and signed by two different child welfare specialists.

3

2. The State of Louisiana failed to prove that there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future and the court did not find the same, but yet terminated parental rights.

3. The Mother was denied Due Process when the court allowed evidence to be presented, without prior notice, via the petition, and later when denied the right to present rebuttal testimony.

4. The mother was improperly denied a New Trial pursuant to *La.Code Civ.Proc. art* [sic] 1971 and 1972.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156; *see also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham County, NC*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the state to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to that of the parent. *In re J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental

4

rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *In re V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the grounds for involuntary termination. Louisiana Children's Code Article 1015(4) sets forth abandonment of the child as a ground for termination:

The grounds for termination of parental rights are:

. . . .

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

. . . .

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

Louisiana Children's Code Article 1015(5) provides the grounds for involuntary termination:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant

5

to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

Louisiana Children's Code Article 1037(B) further requires that the trial court find that the termination be in the best interests of the child and that it provide written findings.

The trial court found by clear and convincing evidence that the parental rights of A.C. should be terminated because:

Greater than one year has elapsed since this child was removed from the parents' custody; . . . . that said parents have failed to substantially comply with their respective case plans including but not

6

limited to failing to obtain and maintain safe, and stable housing, failing to visit with the child as scheduled, failing to maintain contact with the agency, and lack of substantial improvement in redressing the problems preventing reunification; that there is no reasonable expectation of significant improvement in said parents' condition or conduct in the near future; and, that the termination of parental rights is in the best interest of the minor child, [Z.C.].

In its oral ruling the trial court stated:

> [A.C.] has absolutely used poor judgment in understanding the situation of her new husband and the problem it presents to her regaining–being reunified with her son. . . . The Agency is well within it's [sic] policy and the ramifications that comes with a sex offense conviction that the child would be in significant risk and it's—it's entangled with obligations on behalf of sex offenders to register with law enforcement."

A.C. claims that the State failed to meets its burden of proving by clear and convincing evidence that termination was warranted because she had completed her case plan. Further, A.C. argues that she was denied due process in that the trial court incorrectly focused on the status of her husband as a sex offender and did not allow her the opportunity to present evidence that her husband was not a threat to Z.C.

### Evidence and Testimony

Christina Phillips, a foster-care worker, was involved in A.C.'s case from January 2012 through July 2012. Phillips testified regarding the circumstances warranting the State's involvement with Z.C. She discussed the various components of the case plan. Phillips verified that A.C. obtained appropriate housing and employment. She further completed some online parenting classes. Additionally, she attended the necessary substance abuse assessment, where it was determined that treatment was not necessary. However, A.C. did attend Al-Anon meetings. A.C. regularly visited with her son as part of her case plan. Phillips stated that A.C. was working her case plan during this time. However, A.C. then

moved to an apartment. DCFS was working to provide a twin bed to A.C. so that Z.C. could have overnight visits with his mother. However, Phillips said that A.C. did not cooperate with the agency in coordinating overnight visits.

Lazetta West was the next caseworker, assigned to the case from August 21, 2012, through October 2013. West met with A.C. on September 4, 2012, to facilitate Z.C.'s overnight visitation. However, West testified that she never heard from A.C. again, and the trial placement never happened. West said that A.C. never contacted her, even though West sent letters, visited her apartment monthly, and left several messages. West contacted A.C.'s mother to make sure she had the right phone number, which she did. West said A.C. had not made any contact with the agency since a phone conversation in October 2012. However, West said that A.C. did maintain visits with Z.C. as scheduled. A.C. did not attend any of the family team conferences or review hearings or attend additional parenting classes ordered by the court in October 2012. A.C. was referred to a parenting program in November 2012, but the program dismissed the case because the counselor could not get in contact with A.C. She was also scheduled for a psychological evaluation in December 2012, but the psychologist cancelled the appointment because A.C. never contacted the agency. Additionally A.C. missed family team conferences in December 2012 and June 2013. In September 2012, A.C. took a drug test that came back negative, but no other drug tests were obtained. In October 2013, A.C.'s case was transferred to the Iberia office. because she had moved.

On cross-examination West admitted that she did not have any copies of the letters she sent, because she forgot the binder at her office. She said that she sent one a month, but that none were sent certified mail. West verified A.C.'s employment once but said that she never tried contacting A.C. at work. West also

testified that her office mails notices of the family team conferences, and none were returned by the post office as undeliverable. West knew that A.C. was consistently visiting Z.C., because West contacted A.C.'s mother. However, West pointed out that the case plan notes that it is A.C.'s responsibility to maintain contact with the agency and to tell the agency if she moves or changes her phone number. West said that the only component of her case plan that she complied with was visitation.

Fameka Johnson, a foster-care supervisor in Iberia Parish, testified that she contacted A.C.'s mother in June 2013, to ask that A.C. get in contact with the agency. Johnson said that the grandmother informed her that A.C. was working a lot and could not take time off of work to come to the agency. Johnson said that she told the grandmother to have A.C. make contact with either the Lake Charles or Iberia Parish office just to let them know what was going on, but that A.C. never contacted anyone. Finally, Johnson made in-person contact with A.C. in late October 2013.

A.C. expressed a desire to work her case plan, but Johnson informed her that so much time had passed without contact that the situation would have to be reassessed and the case plan started over. A.C. informed Johnson that she was engaged; A.C. subsequently married S.C. in November 2013. Johnson told A.C. that S.C. would have to undergo a background check.[6] S.C. was fingerprinted and his status as a convicted sex offender was revealed. Johnson informed A.C. that Z.C. would not be able to be placed in her home because agency policy prohibits placement in a home with a convicted sex offender, which conflicts with obtaining and maintaining stable housing for the child. Johnson said that A.C. would have to

---

[6] S.C. was convicted in 2009, for attempted indecent behavior with a juvenile.

divorce S.C. before Z.C. could be placed with her, and that Z.C. had been in care for over two years by then. Restarting the case plan would take "a lot of time."

Johnson testified that Z.C. is "doing great" with his grandmother. She said he is very happy there. Johnson believed that it would not be in Z.C.'s best interest to remove him from the stability of his grandmother's home or to allow A.C. to start her case plan over.

Kay Bastain, the caseworker at the time of trial, was assigned the case in October 2013. She said that the grandmother would continue to allow A.C. to visit Z.C. if she was allowed to adopt Z.C. She believed Z.C. should be freed for adoption. A.C. had undergone psychological testing in January 2014, and was being referred to parenting classes again. A.C. was not employed at the time of trial. Bastain said that A.C. had been compliant since she took over the case but noted that Z.C. had been in foster care for over thirty-one months.

Lori Aucoin, CASA volunteer, testified that Z.C. is happy and healthy in his placement with his grandmother, and she recommended that he be freed for adoption.

A.C. testified that for the past thirty-one months she knew that she had to complete the case plan administered by DCFS. A.C. knew overnight visitation was available, but she declined to exercise it because she did not have a good relationship with her mother's husband. When questioned if she believed she had stopped working her case plan, A.C, responded, "I believe that I did not do as much as I should have done." She said that she should have made more efforts to contact the office. She said that she was currently unemployed, but no longer had a financial need to work because of her marriage. A.C. testified that she never received any mail from DCFS, certified or otherwise. She also said she had

10

concerns about S.C.'s sex-offender status, but after conversations with various friends and family member, she did not feel he was any threat to Z.C. A.C. stated that she was not made aware of the legal ramifications of marrying a convicted sex offender regarding Z.C. until the day before trial.

C.G., Z.C.'s grandmother, testified that Z.C. often stayed with her prior to his removal by the state. She said that Z.C. wanted to spend the night with A.C., but that never occurred. She also stated that A.C. rarely called Z.C., maybe three or four times over the course of a year. She characterized her daughter's relationship with her son as one of playmates. C.G. said that A.C. and Z.C. lived with her from the time Z.C. was born until he was about three years old. Thus, he had lived at her home six of his seven years. She stated that the only thing she wanted for Z.C. was for him to be safe and that she did not feel he was safe with A.C. because she still exhibited irrational behavior by marrying a sex offender and leaving a good job, among other things.

*New Trial*

A new trial will be granted "[w]hen the verdict or judgment appears clearly contrary to the law and the evidence." La.Code Civ.P. art. 1972(A). When reviewing the grant or denial of a motion for new trial, an appellate court cannot reverse the trial court's decision unless an abuse of discretion can be demonstrated. *Harbor v. Christus St. Frances Cabrini Hosp.*, 06-593 (La.App. 3 Cir. 11/2/06), 943 So.2d 545.

Following the hearing on the motion for new trial, the trial court stated:

> [T]he decision is to deny the motion for a new trial. Although the evidence of [A.C.'s] marriage to a person who is convicted of a sex offense was a part of the Court's decision, equally and more persuasive was the testimony of her mother as to her relationship with the child, her contact with the child, her attention to the needs of the

11

child, as well as her mother's testimony of her attempts to convince her mother that it was appropriate for the child to be, not only – to be visiting at her home where her husband was in a sex offender status.

I think the grandmother's testimony corroborated the testimony of the agency, of inability to attend to the needs of the child and testimony – The report of Dr. Lagarde indicates to me that his impression is that the information brought to him at that time – Let me see. I'll quote the language from his report. (Court reviewing report.)

Yeah, I, I don't think – It is a pretty lengthy report, but I don't think it would have altered the Court's opinion on the issue of termination of parental rights; therefore, the Court will not consider it to be newly discovered evidence at all. But even assuming that, that the nature of the report and the text messages or other information that you suggested at this argument, does not convince me that the decision should be altered.

The eve-of-trial psychological report does not change the fact that the grounds for termination were met. This report was not crucial to the trial as suggested by A.C. Moreover, it was A.C.'s duty to obtain the psychological report in a timely manner as part of her case plan. Additionally, based on our discussion below, we find that the trial court did not abuse its discretion in refusing to grant A.C.'s motion for new trial.

*Compliance with Case Plan*

A.C.'s case plan consisted of obtaining and maintaining stable housing and employment, attending a psychological evaluation and therapy if recommended, participating in substance abuse assessment and treatment if recommended, and participating in parenting classes.

A.C. did not have any contact with the agency from September 2012 through October 2013. She only completed the psychological evaluation in January 2014; the day before trial. Clear and convincing evidence of failure to meet any of La.Ch.Code art. 1015 grounds is sufficient. A.C. failed to keep in contact with the agency for over a year, a clear demonstration of failure to comply with the case

12

plan under La.Ch.Code art. 1036(C)(3). Further, A.C. failed to comply with the required case plan in that she did not comply with the required program of treatment, a ground for termination under La.Ch.Code art. 1036(C)(5). While A.C. did comply with her case plan in some respects, she did not comply in other aspects. A.C. failed to exercise the overnight visitation that DCFS attempted to coordinate for her. She failed to take the appropriate parenting classes or submit to the psychological evaluation in a timely manner. Further, A.C. failed to provide a stable and safe home for Z.C. A.C. continued to neglect the needs of Z.C. over the course of his tenure in the state's care.

A.C.'s marriage to a convicted sex offender simply evidences her continued neglect of the needs of her son. A.C.'s sporadic and brief efforts to work her case plan are too little, too late. The hurdles that would have to be overcome in order to even consider placing Z.C. in his mother's care would take years to accomplish; years in which the mother's best interest would become paramount to those of Z.C. Parents whose children become entwined in the foster-care system do not have an unlimited amount of time to work their case plan. A consideration of Z.C.'s best interests, as attested to by many witnesses, requires that he be adopted into the stable home where he has resided rather than be subjected to a home occupied by a convicted sex offender. Z.C., who has resided with his grandmother for all but one year of his life, is enjoying a safe and stable childhood, and his need for permanency must trump his mother's desire to try working her case plan again. There is no error in the trial court's finding that Z.C.'s best interest are served by a permanent placement in the stable home he has lived in for the past three years. This assignment of error is without merit.

***Reasonable Lack of Expectation of Significant Improvement***

Louisiana Children's Code Article 1036(D) states:

Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:

(1)     Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

(2)     A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

(3)     Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

A.C. argues that there is a reasonable expectation of reformation. Louisiana Children's Code Article 1036(C) illustrates the considerations that the trial court takes in determining whether there is a reasonable expectation of reformation. *In re S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445. Mere cooperation with DCFS is inadequate; the parents must show improvement over time, even if all of the problems that caused the removal have not been eliminated. *Id.* This requires that the parents significantly modify the behavior that caused the removal. *Id.*

A.C. has not cooperated with DCFS in that she failed to contact them for more than a year. She failed to begin the overnight visits with her son. And finally, she has continued to neglect the needs of her son by failing to provide a safe home environment for him. Accordingly, there is no error in the trial court's finding that there is no reasonable expectation of significant improvement in A.C.'s conduct in the near future. This assignment of error is without merit.

14

*Due Process*

Finally, throughout her brief, A.C. argues that she was denied due process because she was not allowed to present evidence that S.C. would not be a danger to Z.C. First, A.C. was well aware that S.C.'s status as a sex offender would be of issue, since DCFS fingerprinted and conducted a background check of him in October 2013. Finally, even if A.C. had not married a sex offender, the grounds for termination would be satisfied and the best interests of Z.C. would still be met by freeing him for adoption by his grandmother. This assignment of error is without merit.

## CONCLUSION

The judgment of the trial court terminating A.C.'s parental rights to Z.C., is affirmed.

**AFFIRMED**.