# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-119

## STATE IN THE INTEREST OF

## I.C.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 17-JV-018740
HONORABLE LEWIS H. PITMAN, JR., DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Shannon J. Gremillion, Van H. Kyzar, and Sharon Darville Wilson, Judges.

**AFFIRMED;
MOTION TO WITHDRAW GRANTED.**

**Barry L. LaCour**
**Mental Health Advocacy Service**
**Child Advocacy Program**
**302 Dulles Drive Suite U-47 Room D6**
**Lafayette, LA 70508**
**(337) 262-2030**
**COUNSEL FOR APPELLEE:**
    **I.C. (minor child)**

**Diane E. Cote**
**825 Kaliste Saloom Road**
**Brandywine III, Room 150**
**Lafayette, LA 70508**
**(337) 262-5913**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**
    **Department of Children and Family Services**

**S. Marie Johnson**
**Public Defender's Office**
**106 W. Berad Street**
**St. Martinville, LA 70582**
**(337) 394-1446**
**COUNSEL FOR APPELLANT:**
    **C.G. (mother)**

**GREMILLION, Judge.**

The mother, C.G., appeals the termination of her parental rights to her minor child, I.C., and the certification of I.C. for adoption.[1]  C.G.'s counsel filed a motion to withdraw pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396 (1967), asserting that no non-frivolous grounds for appealing exist.  For the following reasons, we affirm the termination of C.G.'s parental rights and certification for adoption and grant counsel's motion to withdraw.

### FACTUAL AND PROCEDURAL BACKGROUND

I.C., born April 2, 2017, is C.G.'s ninth child no longer in her care.[2]  Shortly after I.C.'s birth, the Louisiana Department of Children and Family Services (DCFS) received notification that C.G. was a drug addict and alcoholic and that I.C. was a victim of neglect/inadequate shelter and dependency.  The report indicated that C.G. lacked resources to take care of the baby and the home had no utilities, no glass in the windows, and that the parents were defecating in bags in the bathtub and throwing it outside.  Further, nursing staff at the hospital witnessed a lack of maternal qualities in C.G.  She left I.C. with others to go smoke, which is against hospital policy.

On April 24, 2017, DCFS filed a petition for Child in Need of Care (CINC) alleging that I.C. was a victim of neglect (lack of supervision/lack of adequate shelter/dependency).  A case plan was formulated for C.G.  On September 14, 2018, DCFS filed a petition for termination of parental rights and certification for adoption.  DCFS claimed that C.G. failed to provide significant contribution to I.C.'s care, failed to maintain contact for a period of six consecutive months, there had been no

---

[1] Initials are used throughout in accordance with Uniform Rules—Courts of Appeal, Rule 5-2, in order to protect the identity of the minor.

[2] C.G.'s rights to four of her children were terminated in 2008.  The other four who no longer reside with her are in the custody of their fathers.

substantial compliance with the case plan, and there was no reasonable expectation of significant improvement.

Following a two-day hearing on June 13th and 14th, 2019, C.G.'s parental rights were terminated. A judgment terminating C.G.'s parental rights was filed on June 20, 2019. Review hearings continued. A January 31, 2020 hearing noted that C.G. was unable to be served after multiple attempts and that she was declared an absent parent. Reasons for Judgment were entered into the record on January 29, 2021. C.G. now appeals the trial court's termination of her parental rights and I.C.'s certification for adoption.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to those of the parent. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional,

2

and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id*. at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *State ex rel. V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the following as grounds for termination of a parent's rights to her child:

Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

Louisiana Children's Code Article 1015(6) sets forth another ground for involuntary termination of a parent's rights to her child:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant

to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

Louisiana Children's Code Article 1037(B) further requires that the trial court find that the termination is in the best interests of the child and that it provide written findings for terminating the parental rights to a child.

Evidence at trial included DCFS records and the testimony of various witnesses.

Rondelle Moore, the case worker for C.G. and I.C., testified regarding C.G.'s lack of housing and employment. Moore testified regarding the weekend placement and then month-long trial placement of I.C. in C.G.'s care.[3] She stated that at one visit, I.C. was absent and C.G. said she left I.C. with her cousin for the week while she looked for work. I.C. was at a daycare while the cousin worked. Moore said that C.G.'s speech was slurred. At a second visit, trial placement with C.G. was terminated because C.G. behaved erratically and there was drug residue on the table. I.C. lost two pounds during the trial placement period with C.G. Moore said that C.G. had lived in at least seven different residences since I.C. had been removed from her custody. C.G. also failed to make monthly payments from December 2017 thru December 2018, instead making one lump sum payment of $260 in February 2019, for the missed monthly payments.

Moore testified that C.G. missed several missed drug screens and refused to submit to hair testing. However, C.G. did have numerous negative urine drug screens. Moore described C.G.'s failure to follow through with mental health treatment and medications and her discharge from programs for failing to do so. Over a two-year period, C.G. attended fifty-three of seventy-three scheduled visitations with I.C. C.G. was also incarcerated July 11 through July 18, 2018. Moore stated that C.G. will do well for a period of time and then "falls off." She said C.G.'s behavior is not stable and that "[o]ne minute she's fine and then she [] has aggressive nature towards you." She further concluded that C.G. has no verifiable income to take care of I.C.

---

[3] The trial placement period was from April 30, 2018 through June 5, 2018, when I.C. was returned to the care of the foster parent.

Karen Bryce, an employee of the Extra Mile program, testified that she had difficulty making contact with C.G. for services.[4] On one occasion during the trial placement, she stated that she arrived and found C.G.'s door open and C.G. sitting on the front porch. Bryce said C.G. appeared confused, her speech was slurred, and she was unable to answer any of the questions asked of her. C.G. did not avail herself of the Extra Mile program.

Gwyda Green, I.C.'s foster mother, testified that I.C. came to live with her five days after she was born and has resided with her ever since except during the trial placement period with C.G. Green testified she would adopt I.C. if she were freed for adoption. She further testified that she would allow I.C. to maintain a relationship with C.G.

Tammy Handy, Moore's supervisor, testified regarding the trial placement with C.G. She said that C.G. missed a scheduled court hearing and after the hearing they went to check on her because it was unusual for her to miss court. Upon arrival, they learned that I.C. was being cared for by C.G.'s cousin.

Jessica Haughton, a child welfare specialist with the St. Martin Child Protection Agency, testified that she worked with C.G. while Moore was out for a surgery during the period from February 18, 2019 through sometime in May 2019. She testified regarding a home visit that she found was adequate and also regarding some missed appointments with various programs.

C.G. testified that she has nine children, none of whom she has custody of. Her oldest child was approximately twenty-one years old and the four subsequently born children all had agency involvement. The next two, C.G. testified, were kidnapped by their father. The eighth one, whose age she was unsure of, was also

_____

[4] The Extra Mile program offers services to families such as parenting skills, budgeting skills, relapse prevention, and mental health services.

involved with the agency. Gordon testified she had irregular seasonal jobs that were all paid in cash. She said that she told the workers at Visions that she had an alcohol problem but that was only because they said she had to have a reason to be there.

In its reasons for judgment, the trial court found that DCFS proved by clear and convincing evidence that C.G. failed to comply with her case plan. The trial court found Moore and Haughton's testimony credible, particularly that C.G. does well for months then falls off and does not participate. The trial court noted C.G.'s lack of contact with DCFS from June 5, 2018 thru December 5, 2018, and her failure to visit I.C. during that time. The trial court found the trial placement period with C.G. particularly telling of C.G.'s ability and willingness to parent I.C., stating:

> Of most concern is the testimony of Karen Brice, formerly with DCFS now working for Extra Mile, who met [C.G.] at [C.G.'s] house on May 28, 2018. [C.G.] could only say [I.C.] was at day care, with slurred speech and appearing confused.
>
> . . . .
>
> [C.G.] can do well when a DCFS caseworker is assisting as shown at the commencement of the trial placement. [C.G.] appears today to be doing well with the assistance of her DCFS caseworker. As demonstrated, [C.G.] does well for months and then falls off. From June 5, 2018 to December 5, 2018 and again on April 9, 2019 to May 7, 2019, DCFS had no contact from [C.G.].
>
> [C.G.'s] actions of having [I.C.] to live with a cousin for 2 weeks, while without the assistance of a DCFS caseworker during the trial placements, shows [C.G.] is either not willing or not able to care for [I.C.].

We find no error in that finding. The record supports the factual conclusions of the trial court. C.G. failed to complete her case plan, and there is no reasonable expectation of improvement.

C.G. simply has failed to show she will be able to provide a stable home for I.C. or that she will be able to care for I.C. independently of DFCS. DCFS provides extensive assistance to parents in the form of programs, funding, resources, housing

and the like in order to reunify the parent and child. It is not DCFS's duty to be a permanent co-parent for the child whose biological parent is unable to meet his or her needs. During the trial placement, C.G. placed I.C. in a cousin's care, who then placed I.C. in daycare.

Moreover, I.C. has now been in the custody of the foster parent for nearly four years save for the brief failed temporary placement with C.G. We have previously noted that parents do not have unlimited years to decide to work their case plans. The on-and-off-the-case-plan method of attempting to regain custody of one's child fails—not only fails for the underlying reasons that warranted the removal, but because the longer a child remains in a stable placement, the less it is in the child's best interest to have the stability of a stable placement disturbed by a return to their biological parent. *See State in the Interest of Z.C.*, 14-1082 (La.App. 3 Cir. 2/11/15), 157 So.3d 1204. Accordingly, we affirm the termination of C.G.'s parental rights and the certification of I.C. for adoption.

## CONCLUSION

The trial court's judgment terminating the parental rights of C.G. to I.C. and certifying I.C. for adoption is affirmed. Counsel's motion to withdraw pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396 (1967), is granted.

**AFFIRMED;**
**MOTION TO WITHDRAW GRANTED**.

8