# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**22-14**

**STATE IN THE INTEREST OF**

**P.L.J.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTHEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 34063
HONORABLE W. MITCHELL REDD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, John E. Conery, and Gary J. Ortego, Judges.

**AFFIRMED.**

**Annette Roach**
**CINC Appellate Project**
**Roach & Roach, APLC**
**4315 Lake Street, Suite 4**
**Lake Charles, LA 70605**
**(337) 436-2900**
**COUNSEL FOR APPELLANT:**
    **A.S. (mother)**


**Heath J. Dorsey**
**1919 Kirkman Street**
**P.O. Box 1487**
**Lake Charles, LA 70601**
**(337) 491-2545**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**
    **Department of Children and Family Services**

**GREMILLION, Judge.**

The mother, A.S., appeals the termination of her parental rights to her minor child, P.L.J., and the certification of P.L.J. for adoption.[1] For the following reasons, we affirm the termination of A.S.'s parental rights and P.L.J.'s certification for adoption.

### FACTUAL AND PROCEDURAL BACKGROUND

P.L.J. was born January 3, 2020, at home. The next day, mother and child were transported to the hospital, where P.L.J. tested positive for methamphetamine and exhibited signs of withdrawal. The Louisiana Department of Children and Family Services (DCFS) determined that P.L.J. could not safely leave the hospital, and A.S. did not wish to bring the child to her residence. An Instanter Order was signed January 6, 2020, by the trial court, finding reasonable grounds existed to believe that P.L.J. was a neglected child in need of care (CINC). The affidavit in support of the instanter order attested that A.S. was an I.V. drug user of methamphetamine for the past six years and had methamphetamine and benzodiazepines in her system upon arrival to the hospital. It further noted that A.S. had her rights terminated to three other children following agency involvement.

On January 8, 2020, DCFS filed a CINC petition alleging that P.L.J. was a neglected CINC. Following a February 13, 2020 hearing, A.S. stipulated that P.L.J. was a neglected child in need of care. Three case plans were filed and approved by the trial court on February 13, 2020, May 5, 2020 and January 7, 2021. The case plans set forth detailed goals and requirements for successfully completing the plan. Reports generated by DCFS indicated no progress by A.S. in obtaining substance

---

[1] Initials are used throughout in accordance with Uniform Rules—Courts of Appeal, Rule 5-2, in order to protect the identity of the minor.

abuse treatment, that A.S. did not have stable housing, and that A.S. had not obtained a job.

On March 29, 2021, DCFS filed a petition for certification for adoption and termination of parental rights of A.S. to P.L.J. DCFS claimed that A.S. had abandoned her child, failed to support her child, there had been no substantial compliance with the case plan, and there was no reasonable expectation of significant improvement. DCFS alleged that A.S. failed to secure stable housing, failed to obtain mental health counseling, failed to undergo substance abuse treatment, continued to test positive for illegal substances, among other things, and failed to address the persistence of conditions that led to removal.

Following a two-day hearing on July 7, 2021 and August 18, 2021, A.S.'s parental rights were terminated. A judgment terminating A.S.'s parental rights was signed on June 20, 2019. A.S. now appeals the trial court's termination of her parental rights and P.L.J.'s certification for adoption assigning as error:

> 1. The court manifestly erred in terminating the parental rights of A.S. because the agency failed to show by clear and convincing evidence that: factors beyond A.S.'s control did not hinder her ability to progressively work her case plan; that DCFS provided reasonable efforts to assist A.S. in completing her case plan; and, that there was no reasonable expectation of a significant improvement in the near future.

> 2. The court manifestly erred by finding that the State proved by clear and convincing evidence that termination of A.S.'s rights was in the best interests of P.L.J.

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to

2

terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham Cty., N.C.*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount to those of the parent. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

*Id.* at 811 (citation omitted).

The trial court's decision to terminate parental rights will not be reversed by the appellate court unless it is manifestly erroneous or clearly wrong. *State ex rel. V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the following as grounds for termination of a parent's rights to her child:

Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

Louisiana Children's Code Article 1015(6) sets forth another ground for involuntary termination of a parent's rights to her child:

Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

4

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

Louisiana Children's Code Article 1037(B) further requires that the trial court find that the termination is in the best interests of the child and that it provide written findings for terminating the parental rights to a child.

Evidence at trial included DCFS records and the testimony of various witnesses.

*July 7, 2021 hearing*

Christina Phillips, a child welfare supervisor with DCFS, testified that she had worked for DCFS for nearly fourteen years and was assigned to P.L.J. She testified that P.L.J. was born drug-affected and that A.S. did not have any means for providing for the infant. P.L.J. was adjudicated a CINC. She stated that P.L.J. had been in the State's care since January 4, 2020. Phillips reviewed the case plans set forth for A.S. One component of the case plan was obtaining and maintaining stable housing. Phillips testified that A.S. was unable to complete this requirement. Initially, she lived in a home with frequent drug use, she was then homeless and living in a tent, and after Hurricane Laura, she lived in a motel in the New Orleans area. She returned to Lake Charles and was homeless and living in a tent again. At the time of trial, A.S. had been living in a sober living facility since June 23, 2021. Phillips

5

testified that the sober living facility is not appropriate housing because children are not allowed, and the rooms are shared and do not have space for an infant. Phillips testified that DCFS was unable to make contact with A.S. for extended periods of time from February to May 2021 because her phone was not working and she was moving from place to place.

The case plan required that A.S. provide proof of income; however, A.S. has been unable to provide any. Instead, she relies on her boyfriend's workers' compensation and social security benefits.

A.S. was required to submit to a substance abuse assessment with an agency-approved provider. A.S. did complete the assessment. Initially, outpatient treatment was recommended, but because of her ongoing substance abuse, inpatient treatment was recommended. However, A.S. would need to detox because she was an IV drug user. Phillips testified that A.S. had not complied with inpatient treatment and had only recently started to address her substance abuse issues, which was inadequate. On cross-examination, Phillips was shown a treatment plan created June 1, 2021 by Imperial Calcasieu, but she was unsure if A.S. had complied with the plan.

A.S. was required to submit to random drug screens, which she complied with when she could be found. Phillips testified regarding the drug screens maintained as part of DCFS records. A.S. was tested on 2/18/20, 7/21/20, 7/28/20, 1/29/21, and 5/13/21, and all tests were positive for a combination of amphetamines, benzodiazepines, opiates, and marijuana. One drug test performed by Excelsior House (the sober living facility) on June 23, 2021, the date A.S. entered the facility, was reported as having a negative result. However, this form did not indicate what type of test was conducted (urine, hair) or what types of substances it tested for. It essentially was a dated form with "negative" written on it.

6

The case plan further required that A.S. receive a mental health assessment and follow recommendations of an agency-approved provider. Although she submitted to the assessment, she did not follow through with the recommendations.

A.S. did visit with P.L.J. in person and then virtually when P.L.J. moved to Washington in October or November 2020. Ms. Olivier is the party with whom P.L.J. was placed, and she is the adoptive mother of A.S.'s biological son that A.S. no longer has parental rights to. Phillips testified that P.L.J. is eighteen months old and doing well, although small for her size being in the seventh percentile for her age. Phillips testified that DCFS recommended that A.S.'s rights be terminated and that it was in the best interest of P.L.J. that she be freed for adoption.

A.S. brought some clothing for the infant at the beginning of the case but no other support since that time. Phillips did admit that the case plan did not set forth a specific amount A.S. was to pay but that a parent is not limited by a set amount, noting "they can make any parental contribution toward the care of their child while in foster care."

Phillips opined that A.S. did not substantially comply with her case plan. Nor did she feel there was a reasonable expectation of significant improvement in the near future that A.S. would complete her case plan.

Phillips was questioned about the effects of hurricanes and the COVID pandemic. She stated that DCFS offices were closed at times,[2] but they continued to work. She said DCFS provided parents with cell phones or tablets so that they could continue to work their case plans and have virtual visits with their children. Phillips conceded that finding housing after the devastation wrought by hurricanes was difficult, though not impossible.

---

[2] DCFS's physical building was closed following Hurricane Laura in late August 2020 for six or seven days; following Hurricane Delta, following an iced storm for a week, and following a flood, however, DCFS workers continued to work despite the closures.

7

*August 18, 2021 hearing*

A.S. testified that she has struggled with addiction and was using drugs when pregnant with P.L.J. She stated that had been "clean" since May 8, 2021. She admitted that she procrastinated in addressing her addiction issues, but she feels that she is moving in the right direction. She noted that she had given birth to a son on July 24, 2021, between the last court appearance and this one and the drug test administered on the day of his birth was negative. However, she admitted she had used methamphetamines while pregnant with her most recent child. A.S. stated that she felt she only lost contact with DCFS for a two-week period when she did not have a phone. She said that she sent text messages to the caseworker but received no response. A.S. testified that she did not get a job because she relies on her boyfriend, P.L.J.'s father, for money. A.S. said that "2020 was a very chaotic year for everyone, and nobody knew what was anybody's best interest, and I think that everybody did the best that they could."

A.S. stated that after Hurricane Laura destroyed the home she was living in, she "pitched a tent in a former landlord's backyard," where she lived from December 9, 2020 thru April 7, 2021. She said she would be able to support P.L.J. because she and her boyfriend are not spending all of their money on drugs. A.S. said that she did not look for a job because she and her boyfriend decided that she was not going to work, and she still did not work at the time of trial. She stated that they were able to survive on her boyfriend's $1,300 a month in benefits.

A.S. claimed that Imperial Calcasieu conducted a substance abuse assessment in February 2021 and was to begin in March, but because she had coronavirus, she was not allowed to start until June. A release of medical information was submitted into evidence dated May 25, 2021. When questioned whether she had made substantial improvement in addressing her problems, A.S. stated:

> I feel like I've reached a little bit of sobriety. I've had another child since then that is not drug affected. I obtained a permanent home again, and I'm in therapy with my same therapist. I've re-engaged with my mental health therapy to address, you know, the underlying things that kept me using. I feel like I'm addressing all of my issues. I'm not saying that I've conquered them, or, you know, It's going to be continual work.

A.S. testified that she lived at a home that was damaged in Hurricane Laura from August 2020 thru December 9, 2020. Then from December 9, 2020 thru April 7, 2021, she lived in a tent. On April 7, 2021, she moved to a hotel. She then moved into the Excelsior House in June 2021. A.S. testified that she moved to Lafayette on July 30, 2021, nineteen days before trial, and was living with her boyfriend and newborn son in a one-bedroom apartment. A.S. testified that she had to move to Lafayette because she could not continue living at Excelsior House with her newborn son and there was nowhere affordable to go in the Lake Charles area. A.S. testified that the owner of Excelsior House leased the apartment for them and they are making payments to him. A.S. had an appointment the next day at the Salvation Army to get furniture for the apartment. She testified that she and her boyfriend sleep on an air mattress, and the newborn sleeps in a pack and play. A.S. said that she gave DCFS Olivier's name because Olivier already had adopted her eleven-year-old son.

At the time of trial, A.S. said she was receiving substance abuse treatment from Imperial Health and attends telehealth sessions with Kim Hebert of Compass Counseling for mental health issues. She stated it is a once-a-month standing appointment. She was unsure whether DCFS had received any records from Hebert. Neither she nor her boyfriend have a driver's license or vehicle. She testified that she intended to have a treatment plan set up in Lafayette, but had not yet done so.

*The Trial Court's Ruling*

The trial court found that DCFS failed to prove abandonment by A.S. because DCFS never told A.S. a specified amount she should be sending to support P.L.J. The trial court found that A.S. did not have stable housing and did not have any income, finding it perplexing that she and her boyfriend decided she should not work. The trial court further found:

> Substance abuse treatment, currently the parties are under NA – or attending NA meetings. There's no evidence that they actively sought the treatment prior to that time. There is a history of drug use. The Court is really concerned about the fact that a child was born to the couple as recently as July 24ᵗʰ of 2021. I was very happy to hear that the child was not substance exposed.
>
> I was very concerned to put together the time line that [A.S.] relapsed and used methamphetamines, not just during the pregnancy but just over two months prior to the child being born[.]

The trial court noted the difficulties suffered by the entire community posed by hurricanes and other weather-related emergencies along with COVID but noted that:

> One, during that time, while no progress was being made on the case plans, the child was in foster care, and time didn't stop for the child. The child has been in foster care essentially since birth, and time did not stop for the child posthurricane, and the child was there, bonding with the foster parents. There was testimony on the first day that the child is doing very well and is in an adoptive placement there.
>
> The second thing is the substance abuse issue, which is the issue which led the child to come into custody to begin with, has not by [A.S.]'s admission, improved in the sense that there was a relapse 17 months into this case.
>
> With that, the Court notes that also there was very little progress on the case plan prior to the filing really of the termination of parental rights petition. [A.S.] admitted in her testimony that she did procrastinate on some of those items as well.
>
> The documents produced today by [A.S.] relate to a treatment plan from IMCAL, I believe it was, dated June 1ˢᵗ of 2021, authorization to release records from IMCAL from May 25ᵗʰ of 2021, and honestly, those are things that could have been done a year prior or so.

We talked about housing. The Court is not convinced that the parties are in housing that is secure and stable. So with that, the Court is going to find that the State did in fact meet its burden of proof by clear and convincing evidence that the parents failed to choose substantial compliance with the requirements of their case plan, specifically the fact that the child came into care due to issues related to substance abuse, which has not at this point been addressed by the parties. That behavior, that condition which led the child[] to be removed has not significantly improved.

As to the factor that is there a reasonable belief that the parents would successfully work the case plan if we granted them additional time, again, based on the recent relapse and continued drug use, the Court is going to find, no, that there would not be and that the best interest of the child would be served by the granting of the termination of parental rights.

We find no manifest error in the trial court's findings. From the record, A.S. was only successful in completing the part of her case plan relating to maintaining contact with her child. She did visit P.L.J. in person at first, sometimes walking or riding a bike to the DCFS office and virtually once P.L.J. moved. Otherwise, A.S. failed on every aspect of her plan. Obtaining a substance abuse treatment plan on June 1, 2021, is insufficient to evidence substantial compliance with her case plan. Neither hurricanes nor COVID prevented A.S. from earlier entering substance abuse treatment. Moreover, testing positive for methamphetamines while pregnant with yet another child a mere two months before the trial does not indicate the likelihood of any substantial improvement. On the contrary, it indicates the continuation of subjecting newborn infants to exposure to illegal drugs and putting her desires above her children's safety.

A.S. argues that DCFS did not prove by clear and convincing evidence that it made reasonable efforts to assist A.S. as required by La.Ch.Code art. 626(B) before resorting to termination of her parental rights. We disagree. DCFS gave A.S. all the assistance and information she needed to begin the most significant aspect of her plan, i.e., substance abuse treatment. A parent need only fail to meet one of the case

plan requirements for her rights to be terminated. *State in the Interest of J.A.*, 17-500 (La.App. 3 Cir. 1/4/18), 237 So.3d 69. Moreover, this is not A.S.'s first encounter with DCFS. She should be well aware by now of how case plans work since she has lost custody to three of her other children. Finally, as we have recently stated:

> We have previously noted that parents do not have unlimited years to decide to work their case plans. The on-and-off-the-case-plan method of attempting to regain custody of one's child fails—not only fails for the underlying reasons that warranted the removal, but because the longer a child remains in a stable placement, the less it is in the child's best interest to have the stability of a stable placement disturbed by a return to their biological parent. *See State in the Interest of Z.C.*, 14-1082 (La.App. 3 Cir. 2/11/15), 157 So.3d 1204.

*State in the Interest of I.C.*, 21-119, pp. 9-10 (La.App. 3 Cir. 11/3/21), 330 So.3d 703, 708-09.

Similarly, deciding to start working your case plan eighteen months in is unacceptable. A.S. failed to complete her case plan, and we find no reasonable expectation of improvement. It is in the best interest of P.L.J. that she remains in the stable home she has enjoyed for more than two years and be freed for adoption. A.S. complains that the trial court failed to articulate why it would be in P.L.J.'s best interests for A.S.'s rights to be terminated. A.S. states, "Although the child has likely forged a bond with the foster parents, it should not override the familial bond she shares with A.S." We disagree. P.L.J. is in a placement with the familial bond of her half-brother. Moreover, P.L.J.'s best interest is not served by being subjected to her mother's last-minute attempt to obtain sobriety and provide a stable living environment for her children.

## CONCLUSION

The judgment of the trial court terminating A.S.'s rights to P.L.J. and certifying her for adoption is affirmed.

**AFFIRMED**.